**In re the GAP STORES SECURITIES LITIGATION.**

**No. MDL–277 SW.**

United States District Court, N. D. California.

June 12, 1978.

---

288

Charles A. O'Brien, San Francisco, Cal., for plaintiff's liaison.

David B. Gold, San Francisco, Cal., for plaintiff's committee.

Charles A. Legge, Bronson, Bronson & McKinnon, San Francisco, Cal., for defendant's liaison.

W. Reece Bader, Robert P. Feldman, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant's committee.

## MEMORANDUM OPINION AND ORDER

SPENCER WILLIAMS, District Judge.

The thirteen cases involved in this multidistrict securities litigation are before the court on plaintiffs' motion to certify a defendant class of underwriters.[1] Previous to this motion and by stipulation of the parties, plaintiffs amended their uniformly stated complaints to add Bacon, Whipple & Co. as a defendant and to allege, with respect to counts Three, Four and Five of the complaint, a class of defendant underwriters represented by the three individually named underwriters. Plaintiffs here move the court to certify the alleged class more particularly described as: "All those underwriter firms who entered into the May 19, 1976 'Agreement Among Underwriters' which formally established the underwriting syndicate for the initial distribution of 1.2 million shares of common stock of the Gap Stores, Inc." The designated "generals" of the opposition—Lehman Brothers, Inc., Merrill Lynch, Pierce Fenner & Smith, Inc. and Bacon, Whipple & Co.—vigorously decline the commission.

Previous to this motion the court certified a plaintiff class described as: "All persons who purchased or otherwise acquired the common stock of the Gap Stores, Inc. from May 19, 1976 through August 18, 1976 and who sustained damages as a result thereof." For reasons set forth more fully below it is the court's determination that this class of aggrieved purchasers should be permitted to proceed under § 11 of the 1933 Securities Act against the underwriters as a defendant class. Because this determination raises several questions of first impression in this circuit and with little precedent elsewhere, the matter is considered at some length.

### FACTUAL BACKGROUND

These actions arise out of the first public offering of common stock in the Gap Stores, Inc. Commencing on May 19, 1976, 1.2 million shares of Gap common stock were issued pursuant to a registration statement and prospectus of the same date. Over the

---

1. C–76–1792–SW *Catherine L. Freeman, et al. v. The Gap Stores, Inc., et al.;*

C–76–1824–SW *Arthur Norack, et al. v. The Gap Stores, Inc. et al.;*

C–76–1893–SW *Seymour Lazar v. Donald G. Fisher, et al.;*

C–76–1922–SW *Louise Williams, et al. v. The Gap Stores, Inc., et al.;*

C–76–1957–SW *Charles M. Dresow, et al. v. The Gap Stores, Inc., et al.;*

C–76–2205–SW *Adolph P. Schuman, et al. v. The Gap Stores, Inc., et al.;*

C–76–2276–SW *Harvey B. Perly, et al. v. The Gap Stores, Inc., et al.;*

C–76–2297–SW *Alan Hom, et al. v. The Gap Stores, Inc., et al.;*

C–76–2374–SW *Marilyn Skydel v. The Gap Stores, Inc., et al.;*

C–76–2718–SW *Maurice Posner v. The Gap Stores, Inc., et al.;*

C–77–0013–SW *Max Krug, et al. v. The Gap Stores, Inc., et al.;*

C–77–0014–SW *F. Levinson, et al. v. The Gap Stores, Inc., et al.;*

C–77–0015–SW *Ronald Derwin, et al. v. The Gap Stores, Inc., et al.*

summer of 1976 the stock gradually slid downward from the original offering price of $18 per share and on August 13, 1976, when the Gap disclosed a fourth quarter loss of $131,392, the stock dropped further reaching a low of $8 per share by August 18, 1976. Gap management blamed its unprecedented loss on the need for extraordinary markdowns of merchandise to reduce inventory levels. Shortly thereafter, plaintiffs filed these actions alleging violations of various federal and state securities laws. The common theme of the alleged violations is that the registration statement and prospectus misrepresented the value of the Gap securities and the efficiency of the merchandise inventory system.

The underwriting syndicate responsible for the distribution of the Gap offering was established formally in May of 1976 by a written agreement among the ninety-three underwriters. This 'Agreement Among Underwriters' is central to plaintiffs' claim that certification of a defendant class is merely proper judicial recognition of arrangements among the underwriters *inter se*. Plaintiffs point out that pursuant to this agreement the ninety-one participating underwriters not only designated Merrill Lynch and Lehman as managing underwriters but specifically authorized them to act on behalf of each participating underwriter to negotiate changes in the purchase agreement with the issuer and to borrow funds, incur expenses and charge fees. The seminal argument for certification, however, rests upon section 16 of the Agreement which provides in pertinent part:

> In the event that at any time any person other than an Underwriter asserts a claim against one or more of the Underwriters or against you as Representatives of the Underwriters arising out of an alleged untrue statement or omission in the Registration Statement . . . or in any preliminary prospectus or the Prospectus . . . or relating to any transaction contemplated by this Agreement, we [the participating underwriters] authorize you [the managing underwriters] to make such investigation, to retain such counsel for the Underwriters and to take such action in the defense of such claims as you may deem necessary or advisable. You may settle such claim with the approval of a majority in interest of the Underwriters. We agree to pay our proportionate share (based upon our underwriting obligation) of all expenses incurred by you . . . in investigating and defending against such claim and our proportionate share of the aggregate liability incurred by all Underwriters in respect of such claim . . . whether such liability is the result of a judgment against one or more of the Underwriters or the result of any such settlement. . . .

Plaintiffs argue that this wagon circling pact justifies the certification of a defendant class of underwriters. By the manner in which they approach certification, however, plaintiffs acknowledge the instant case defies such a simplistic conclusion. First, they allege a class limited to Counts Three, Four and Five of the complaint which state causes of action under §§ 11 and 12(2) of the 1933 Securities Act, and §§ 25401, 25501, 25504 of the California Corporations Code. In so doing, they tacitly admit the impracticality of class proof on the remaining counts which allege violations of § 10(b) of the 1934 Securities Exchange Act and § 17(a) of the 1933 Securities Act as well as common law deceit and negligence. Second, they seek to eliminate potentially disabling conflicts of interest between the managing and participating underwriters by naming Bacon, a participating underwriter and random victim, as a class representative. Finally, one plaintiff on his own and twelve plaintiffs as a group have filed "protective" suits in this district naming the underwriters individually. In this manner, plaintiffs seek to protect their cause of action if certification is denied and to discourage defendants from opting out if a (b)(3) class is certified. While it is doubtful that joinder of some ninety defendants would be practicable, this court is essentially faced with the choice of adjudicating the underwriter's liability on a class or an individual basis.

## DEFENDANT CLASS ACTIONS

Federal Rule of Civil Procedure 23, in deceptively simple terms, provides for the maintenance of defendant class actions satisfying the same standards as plaintiff class actions.[2] Common sense suggests the two are not entirely the same. *See generally* 1 H. Newberg, Newberg on Class Actions § 1148 (1977) [hereinafter cited as Newberg]; 7 C. Wright & A. Miller, Federal Practice and Procedure § 1770 (1972) [hereinafter cited as Wright & Miller]; Parsons & Starr, *Environmental Litigation and Defendant Class Actions: The Unrealized Viability of Rule 23,* 4 Envir.L.Q. 881 (1975) [hereinafter cited as Parsons & Starr]; Note, *Defendant Class Actions,* 91 Harv.L. Rev. 630 (1978) [hereinafter cited as *Defendant Class Actions*].

Commentators have frequently criticized the potential for inadequate representation of defendant classes. Because the named defendant generally does not seek his representative status and often vehemently opposes it, a court may fear that an unwilling representative will necessarily be a poor one. *Defendant Class Actions* at 639. Related to this concern is the fear that the plaintiff will exercise his power of selection to appoint a weak, ineffective opponent as class representative. *Id.* at 640. "It is a strange situation where one side picks out the generals for the enemy's army." Z. Chafee, Some Problems of Equity 237 (1950).

 Upon closer examination, however, these concerns appear less justified than

some others. Ironically, the best defendant class representative may well be the one who most vigorously and persuasively opposes certification since he is the one most likely to guarantee an adversary presentation of the issues. *Defendant Class Actions* at 639. In fact, a court should be suspicious of a willing defendant class representative because of the likelihood of collusion with the plaintiff. Thus, the focus upon the defendant's desire to represent his class is misplaced. The real concern with an unwilling class representative should be his ability to carry the inevitable added expense of class defense and the fairness of placing that burden upon him.[3]

Plaintiff's selection of the defendant class representative, on the other hand, does not necessarily raise issues different from those present in plaintiff class suits, for plaintiff class members, in all probability, have as little to say about the selection of their representatives as do defendant class members. *Id.* at 640 n.58. Problems of representativeness—that is, commonality of claims, stake in the litigation, competency of counsel, and resources to litigate—are equally present where the plaintiff class representative is self-appointed.[4]

More disquieting than the potential of inadequate representation is the *fact of representative adjudication* itself. In theory there may be no legitimate distinction between a judgment eliminating an absent class member's monetary claim and one ordering an absent class member to pay, but in practice people respond quite differently

**2.** Federal Rule of Civil Procedure 23(a) provides in pertinent part: "One or more members of a class may sue or *be sued* as representative parties on behalf of all only if . . . the claims or *defenses* of the representative parties are typical of the claims or *defenses* of the class . . . ."

**3.** For suggestions regarding allocation of the added expense of the class defense see *Defendant Class Actions* at 647–50.

**4.** As is discussed more fully below, there is no problem in the instant case with the quality of representation likely to be forthcoming from two of the named class representatives. First, Merrill Lynch and Lehman are represented by able counsel. Second, as managing underwrit-

ers they are the natural representatives of the class; the class itself has appointed them to represent any of their number sued because of an alleged misstatement or omission in the registration statement or prospectus. And, third, from all appearances Merrill Lynch and Lehman possess substantial resources to conduct this litigation even though the added costs of defense may not be borne by them since the Agreement Among Underwriters obligates each participating underwriter to pay his proportionate share of litigation costs. In sum, nothing before the court suggests that Merrill Lynch and Lehman are not the paradigm representatives.

to lost claims as opposed to new-found obligations. Two authors, Peter Parsons and Kenneth Starr, have reviewed the use of defendant class actions in environmental litigation and have carefully explored the due process problems posed by defendant' class adjudications. They have observed:

The basic constitutional dilemma of defendant class actions arises out of the due process rights of absent members of the defendant class. Fundamental to due process is the notion that the authoritative determination of a personal liability, obligation or right of a defendant requires the court's in personam jurisdiction over that party.

The other horn of the dilemma grows from the class action concept that in personam jurisdiction over all class members is not mandatory. Imposing such a requirement would completely undercut the broad purposes of the class action device—requiring personal jurisdiction over all of the class members would in effect destroy the class action concept since by definition there could be no "absent" members. All class members would have to be named and be before the court as a prerequisite to the prosecution of the action. This tension between the due process requirements and the nature of the class action has been resolved for *plaintiff* class actions by requiring that the designated class representatives *adequately represent* the interests of the entire class. If the named parties are effective representatives of the broader class, absent members are viewed as vicariously present and thus afforded their day in court. Parsons & Starr at 888–89.

The fiction of vicarious presence may be justified in plaintiff class actions, the authors explain, where "many if not all absent members of a plaintiff class would never enjoy a day in court but for the class action," and "while technically lacking a day in court" they "are compensated by free, effective representation and the possibility of a windfall recovery in a suit they might never have brought." *Id.* at 892. The same fiction may not be justified in defendant class actions where, "no defendant class member will be effectively 'deprived' of his day in court by dismissal or limitation of the defendant class action," *id.*, since most defendants seek to eliminate such days in court. Similarly, "[a]ny presumed advantage inuring to the absent defendant from the elimination or reduction of attorney's fees is outweighed by being thrust into the litigation at all, or, if suit was inevitable, by loss of control of the litigation resulting from not having been designated a class representative. *Id.*

Because of these differences between plaintiff and defendant class actions, Parsons and Starr conclude that certain limitations on the exercise of jurisdiction must be observed.[5] Elemental concepts of due process require that a defendant not suffer a binding adjudication of his rights and liabilities unless there have been reasonable attempts to notify him of the pendency of the action, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and unless he has certain minimum contacts with the forum state, *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). With respect to defendant class actions Parsons and Starr translate these requirements as follows: notice to the representative cannot be deemed the functional equivalent of notice to the class because the defendant class representative's interests are not necessarily coextensive with those of the class; second, strict application of the "minimum contacts" test is unnecessary because the class member need not sustain any inconvenience to defend himself in the litigation. Parsons & Starr at 893–97. Therefore, in the context of defendant class actions due process requires notice to

---

5. Parsons and Starr also base their conclusion upon *Christopher v. Brusselback,* 302 U.S. 500, 58 S.Ct. 350, 82 L.Ed. 388 (1938), wherein the Supreme Court, "indicated that Equity Rule 38, the precursor of Rule 23, could only be used to determine absent defendants' rights to property within the court's jurisdiction. . . . [and] intimated that absent defendants cannot be bound by determinations of personal liability." Parsons & Starr at 888.

each class member and the exercise of jurisdiction only in circumstances fundamentally fair to absent non-litigating class members. *Id.*[6]

This analysis is persuasive. Notice to each class member guarantees no absent defendant will be held liable for a money judgment without knowing of the pendency of the proceedings. Such a rule prevents plaintiffs from escaping *Mullane's* notice requirements by use of the class action device.[7] Furthermore, consideration of the absent class members relation to the forum, with an eye toward the fundamental fairness of adjudication in that particular forum, assures, for example, that absent members of (b)(3) classes have a reasonable opportunity to exercise their right to intervene pursuant to Federal Rule of Civil Procedure 23(c)(2)(C). It also assures the law of the forum will not be applied beyond the limits of its sovereignty, a concern inherent in the *International Shoe* "minimum contacts" test.[8]

Although defendant class actions seem to demand greater attention to the due process rights of absent class members, they are not otherwise greatly dissimilar from plaintiff class actions. Despite this essential similarity defendant classes are seldom certified. They are most commonly found in patent infringement cases, *see, e.g., Dale Electronics, Inc. v. R.C.L. Electronics, Inc.,* 53 F.R.D. 531 (D.N.H.1971); *Research Group v. Pfister Associated Growers, Inc.,* 301 F.Supp. 497 (N.D.Ill.1969); *Technograph Printed Circuits, Ltd. v. Method Electronics, Inc.,* 285 F.Supp. 714 (N.D.Ill.1968); *but see Sperberg v. Firestone Tire & Rubber Co.,* 61 F.R.D. 70 (N.D.Ohio 1973); *see generally* 1 Newberg at 251–52; or in suits against local public officials challenging the validity of state laws, *see, e.g., Hopson v. Shilling,* 418 F.Supp. 1223 (N.D.Ind.1976) (welfare law); *Tucker v. City of Montgomery Bd. of Comm'rs,* 410 F.Supp. 494 (M.D. Ala.1976) (statutes governing appellate procedures and allocation of court costs and fees); *Danforth v. Christian,* 351 F.Supp. 287 (W.D.Mo.1972) (state voting residency requirements); *Union Pac. R.R. v. Woodahl,* 308 F.Supp. 1002 (D.Mont.1970) (state labor law); *Wilson v. Kelley,* 294 F.Supp. 1005 (N.D.Ga.) (three-judge court) *aff'd per curiam,* 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968) (law regulating county and city jails); *but see Mudd v. Busse,* 68 F.R.D. 522 (N.D.Ind.1975) (bail procedures); *see generally* 1 Newberg at 252–54; *Defendant Class Actions* at 632, 643–44.[9] But, attempts to certify defendant classes in antitrust cases have been generally unsuccessful, *see, e.g., Kline v. Coldwell Banker & Co.,* 508 F.2d 226 (9th Cir. 1974); *Coniglio v. Highwood Servs. Inc.,* 60 F.R.D. 359 (W.D.N.Y.1972); *Contract Buyers League v. F. & F. Investment,* 48 F.R.D. 7 (N.D.Ill.1969); *but see Management Television Sys., Inc. v. National Football League,* 52 F.R.D. 162 (E.D.Pa.

---

**6.** Nothing in the nature of defendant class actions suggests different rules should be followed with respect to satisfaction of subject matter jurisdiction and venue. In all likelihood subject matter jurisdiction will be more easily satisfied for defendant classes than for plaintiff classes since defendants need not satisfy amount in controversy requirements. *Defendant Class Actions* at 635; *see generally* 7 Wright & Miller at 547–53. As with plaintiff class actions courts will look to the residence of the named parties for determining whether venue is proper since the utility of class actions might otherwise be seriously impaired. *Research Corp. v. Pfister Associated Growers, Inc.,* 301 F.Supp. 497, 501 (N.D.Ill.1969); 7 Wright & Miller § 1757 at 568–69; *Defendant Class Actions* at 636.

**7.** Notice to the ninety-one participating underwriters presents no problem in this case because each class member's name and address is known.

**8.** Whether it is fair to subject the participating underwriters to "vicarious" suit in this forum is considered *infra* regarding the Fifth count of the complaint which alleges a violation of California law.

**9.** For other cases certifying defendant classes see *Appleton Electric Co. v. Advance-United Expressways,* 494 F.2d 126 (7th Cir. 1974) (interstate commerce rates); *Advertising Specialty Nat. Ass'n v. F.T.C.,* 288 F.2d 108 (1st Cir. 1956) (price fixing); *United States v. Truckee-Carson Irrigation Dist.,* 71 F.R.D. 10 (D.Nev. 1975) (water rights litigation); *Guy v. Abdulla,* 57 F.R.D. 14 (N.D.Ohio 1972) (voidable preferences in bankruptcy).

1971); *Research Corp. v. Pfister Associated Growers, Inc.*, 301 F.Supp. 497 (N.D.Ill. 1969), as have reported attempts to certify defendant classes in securities litigation, *see, e.g., Guarantee Insurance Agency v. Mid-Continental Realty Corp.*, 57 F.R.D. 555 (N.D.Ill.1972); *Benzoni v. Greve*, 54 F.R.D. 450 (S.D.N.Y.1972).

One apparent difficulty with defendant class actions is determining how to handle individual defenses. Unlike plaintiff class actions, successful defendant class actions traditionally have been limited to resolution of issues perfectly common to all class members. *Defendant Class Actions* at 637. As a result, they have been used essentially as a device to permit the offensive assertion of collateral estoppel on the common issues against non-parties, rather than as a mechanism for the adjudication of the rights and liabilities of each class member in a single proceeding. *Id.*[10] In patent cases, for example, this has meant that issues of patent validity, fraud on the patent office, and patent misuse have been litigated as class issues while each case of infringement has been separately tried. *E.g., Technograph Printed Circuits, Ltd. v. Method Electronics, Inc.*, 285 F.Supp. 714 (N.D.Ill.1968). Thus, defendant class actions are commonly used in a conservative fashion to adjudicate less than the whole controversy.

Where defendant classes oppose plaintiff classes certain rules unique to this circuit may also be triggered. Recently, the Ninth Circuit reversed trial court certification in three cases in which large plaintiff classes were opposed by large defendant classes. While none of the circuit's opinions directly addressed the problems of defendant class certification each expressed a common theme of discomfort with bilateral class actions. These cases, therefore, are important for the limitations they inherently place on the use of defendant class actions.

In *LeMar v. H. & B. Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), Judge Sneed, writing for the panel, addressed the issue before the court as "whether a plaintiff having a cause of action against a single defendant can institute a class action against a single defendant *and* an unrelated group of defendants who have engaged in conduct closely similar to that of the single defendant on behalf of all those injured by all the defendants sought to be included in the defendant class." 489 F.2d at 462. The first of the two cases consolidated on appeal in *LaMar* involved a Truth-in-Lending action brought on behalf of an estimated 33,-000 customers of all pawn brokers licensed to do business in Oregon. The second case named only eight defendants but purported to seek relief for all persons who had been overcharged in violation of the Federal Aviation Act when purchasing tickets from the defendant airlines. Reading the doctrine of standing into the requirements of Rule 23 the court held that "typicality is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies." 489 F.2d at 465. Similarly, the court expressed the view that a plaintiff who has no cause of action against a particular defendant cannot fairly and adequately protect the interests of the class members who do. 489 F.2d at 466. The single exception envisioned by the court—to the blanket rule that each named plaintiff must have a cause of action against every member of the defendant class—involved cases where the defendants were related by law or conspiracy.

> Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury. Nor is it intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious. 489 F.2d at 466.

The next case in this series involved just such an alleged conspiracy. The consolidated multidistrict litigation before the court

---

**10.** More adventuresome uses of defendant class actions are suggested in Parsons & Starr at 898–913 and *Defendant Class Actions* at 650–658.

in *In re Hotel Telephone Charges*, 500 F.2d 86 (9th Cir. 1974), alleged a nationwide conspiracy among forty-seven hotel chains and 600 individual hotels to increase room rents by way of disguised telephone charges in violation of federal antitrust laws. Plaintiffs' class was estimated to include forty million people each of whom had a claim for damages of about $2.00. Certification was inappropriate, the Ninth Circuit ruled, because individual questions predominated over any common questions raised by the alleged conspiracy.

> In order substantially to establish each hotel's involvement in a conspiracy to violate the antitrust laws, participation would be a requisite element of proof. Furthermore, since the surcharges varied from hotel to hotel, the amount of each defendant's surcharge would necessarily require individual treatment, as would the period in which each hotel's surcharge was in effect. . . . After the basis of computing damages had been individually determined for each defendant, each member of the class seeking recovery would then be required to prove that he patronized the hotel while the surcharge was in effect and that he absorbed the cost of the surcharge. Furthermore, it would then be necessary to compute the amount of damages due the class member. In a class of forty million, assuming only ten percent of these unknown class members came forward with claims, and assuming the proof of each claim required only ten minutes, approximately one hundred years would yet be required to adjudicate the claims. Unless the court is to allow the procedural device of the class action to wear away the substantive antitrust cause of action, this suit raises far too many individual questions to qualify for class action treatment. 500 F.2d at 89.

The court's determination was heightened by its conviction that the suit was initiated and maintained primarily by attorneys, acting in the dual capacity of named plaintiffs and counsel for plaintiffs, solely for the purpose of reaping handsome fees. 500 F.2d at 92.

The final case in this series involved defendants united not only by allegations of conspiracy but also by common membership in a trade association. *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974). The trial court had certified Richard and Margo Kline as representatives of a class of all persons who sold residential property within Los Angeles County, California during the four years before the complaint was filed, and who used the services of one or more of the named defendant real estate brokers or any member of the Los Angeles Realty Board. The named defendants were certified as representatives of all the real estate brokers who had been members of the realty board during the same period. Rough estimates set the plaintiffs' class at 400,000 and defendants' class at 2,000. Plaintiffs alleged that the Board had established a fee schedule and sought to use the schedule and theories of "membership ratification" and "adherence" to establish a violation of Sherman 1. Rejecting the premise that either theory could avoid the necessity of individualized proof, the circuit again found that common questions did not predominate. 508 F.2d at 230–33. Another focus of the court's concern in this case, however, was the unfair burden certification would place on defendant class members. Pointing to the provisions for treble damages and the prayer for joint and several liability, the court explained:

> The intent of Congress under section 4 of the Clayton Act, 15 U.S.C. § 15, appears to have been to impose punishment upon the violator of section 1 of the Sherman Act for his own malefactions not to subject him to vicarious liability for the staggering damages of the multitudes. For example, if the sole enterprise real estate broker with a small suburban business finds that out of $10,000 in commissions he has earned in the year past, $1,000 has been determined to consist of overcharges for which in an antitrust action, he becomes obligated to pay $3,000 as treble damages. But because he joined a realty board and received and followed suggestions as to proper commissions he is now

obligated legally to pay $750 million. 508 F.2d at 235.

■ When read together, *LaMar, Hotel Telephone Charges* and *Kline* set forth certain ground rules for plaintiff classes attempting to set up defendant class opposition. Preliminarily, certification will not be forthcoming unless every named plaintiff has a cause of action against every member of the defendant class except where the defendants are related by law or conspiracy. Even then, plaintiffs attempting to certify defendant classes under Rule 23(b)(3) must demonstrate clearly that common questions do in fact predominate over individual questions. Finally, a defendant class action may be simply an inappropriate method of adjudicating any case where the combination of punitive damages and joint and several liability threaten to transform a statutory scheme for personal accountability into ready martyrdom for the unlucky defendant whose deep pocket will pay for the sins of the multitude.

## AN UNDERWRITER CLASS

■ In these actions for violation of the securities laws, plaintiffs have focused on the terms of the Agreement Among Underwriters to argue that certification of the

defendant class would be proper judicial recognition of the arrangements among the underwriters *inter se.* The clear message of *In re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir. 1974) and *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir. 1974), however, is that Rule 23 requires careful consideration of the *substantive issues to be tried.* In the following discussion, then, the counts of the complaint will be considered individually. But, in so doing, the court is nonetheless mindful that class actions have been more readily approved in securities cases than in anti-trust cases because they are considered necessary to protect the marketplace from fraud.[11] "The availability of the class action to redress [securities fraud] has been consistently upheld, . . . in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *Blackie v. Barrack,* 524 F.2d 891, 903 (9th Cir. 1975).

## Count Three—§ 11 of the Securities Act of 1933

■ Count Three of the complaint alleges a violation of Section 11 of the Securities Act of 1933, 15 U.S.C.A. § 77k.[12] Professor

---

**11.** Quoting *LaMar v. H&B Novelty & Loan Co.* for the proposition that class actions are inappropriate under the Consumer Credit Protection Act, the Ninth Circuit wrote in *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 235 (9th Cir. 1974), "[w]e find that the same reasoning applies to treble damage actions under the Sherman and Clayton Acts."

**12.** 15 U.S.C. § 77k (1971) reads in full:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of

the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that

such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

(b) Notwithstanding the provisions of subsection (a) of this section no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof—

(1) that before the effective date of the part of the registration statement with respect to which his liability is asserted (A) he had resigned from or had taken such steps as are permitted by law to resign from, or ceased or refused to act in, every office, capacity, or relationship in which he was described in the registration statement as acting or agreeing to act, and (B) he had advised the Commission and the issuer in writing that he had taken such action and that he would not be responsible for such part of the registration statement; or

(2) that if such part of the registration statement became effective without his knowledge, upon becoming aware of such fact he forthwith acted and advised the Commission, in accordance with paragraph (1) of this subsection, and, in addition, gave reasonable public notice that such part of the registration statement had become effective without his knowledge; or

(3) that (A) as regards any part of registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and (B) as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert, (i) he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) such part of the registration statement did not fairly represent his statement as an expert or was not a fair copy of or extract from his report or valuation as an expert; and (C) as regards any part of the registration state-

ment purporting to be made on the authority of an expert (other than himself) or purporting to be a copy of or extract from a report or valuation of an expert (other than himself), he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement of the expert or was not a fair copy of or extract from the report or valuation of the expert; and (D) as regards any part of the registration statement purporting to be a statement made by an official person or purporting to be a copy of or extract from a public official document, he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue, or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement made by the official person or was not a fair copy of or extract from the public official document.

(c) In determining, for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

(d) If any person becomes an underwriter with respect to the security after the part of the registration statement with respect to which his liability is asserted has become effective, then for the purposes of paragraph (3) of subsection (b) of this section such part of the registration statement shall be considered as having become effective with respect to such person as of the time when he became an underwriter.

(e) The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, that if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security

Loss, writing in 1960, described § 11 as "the *bete noir* which was going to stifle legitimate financing—[but which only] produced two reported recoveries in almost twenty-eight years." III L. Loss, Securities Regulation (2d ed. 1960) 1721 [hereinafter cited as Loss]. Although the statute has been more frequently invoked in recent years, reported cases interpreting § 11 are scarce resources. Modeled on the provisions of the English Companies Act, this statute was designed to protect the investing public by compelling detailed disclosure of facts sufficient to put the buyer in the same league with the seller. Section 11 gives the purchaser of a security issued under a *registration statement* containing a *material misstatement or omission* a cause of action against five specific groups of individuals including the issue's underwriters.[13]

Summarizing the more distinctive features of § 11, the plaintiff must prove the registration statement contained a material misstatement or omission *when it became effective,* 15 U.S.C. § 77k(a), but he need not be in *privity* with the defendant and he need not prove *reliance, causation,* or *scienter.* To a very limited extent, causation enters with a reverse twist as a part of the defendant's case. A defendant underwriter may escape liability by proving the plaintiff acquired the security with *knowledge* of the untruth or omission, 15 U.S.C. § 77k(a), or may reduce his liability by proving that the depreciation in value of the security was not caused by the particular misstatement or omission in the registration statement for which he is liable, 15 U.S.C. § 77k(e).[14]

The most complicated aspect of § 11 is found in the varying degrees of care that the defendant must have exercised in order to exonerate himself from liability, 15 U.S.C. § 77k(b). For underwriters the defense has come to be called *due diligence.*

resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) of this section for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public. In any suit under this or any other section of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

(f) All or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

(g) In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public.

13. Full and fair disclosure of the facts in the registration statement may be particularly important to the protection of the small investor. One author has observed, "[a]lthough otherwise regarded as something of an endangered species, [one study has shown] individual investors have accounted for nearly seventy-three percent of all purchases of new common stock issues. . . ." M. P. Dooley, *The Effects of Civil Liability on Investment Banking and the New Issues Market,* 58 Va.L.Rev. 776, 781 (1972) (footnotes omitted) [hereinafter cited as Dooley].

14. If the purchaser acquires the security after the issuer has made generally available an earnings statement for a twelve month period commencing after the effective date of the registration statement, then the purchaser must prove *reliance* on the registration statement to recover, although he need not prove that he read the statement. 15 U.S.C. § 77k(a).

To meet this standard of care the underwriter must prove with respect to the *non-expertised* portions of the registration statement that he conducted a "reasonable investigation" and that he had "reasonable grounds to believe" as well as "belief in fact," as of the effective date, the statements were true and there were no misleading omissions. In the unlikely circumstance where the underwriter prepared a portion of the registration statement as an *expert,* he must meet the same standard of care with respect to his expert statements. As to the *expertised* portions (other than his own expert statements) and as to portions based upon *official statements or documents* the underwriter need only show that he had "no reasonable ground to believe and did not believe," as of the effective date, there were any misleading statements or omissions in the expertised or official portions of the registration statement. Reasonable ground for belief and reasonable investigation are further defined by the act to be that reasonableness "required of a prudent man in the management of his own property," 15 U.S.C. § 77k(c).

While the elements of the plaintiff's case may be easy to satisfy the limitations on damages in § 11 make the statute no bonanza for defrauded purchasers. In the first place, aggregate damages can never exceed the price at which the security was offered to the public, 15 U.S.C. § 77k(g). Within this paramount limitation damages are still to be measured by the difference between the purchase price (but not more than the offering price) and the value of the security at the time of suit or at the time of sale if disposed of before suit, 15 U.S.C. § 77k(e). When the security is sold after suit has been filed damages are measured by the lesser of the difference between the purchase price and the sale price or the value of the security at the time suit was initiated. As Loss explains,

"[i]f the market goes up *pending suit* and the security is disposed of before final judgment, the defendant gets the benefit of the increase over the value at the time of suit; but if the market goes *down* and the security is disposed of pending suit, the plaintiff still gets only the difference between the purchase price and the value at the time of suit. In other words, it is to the plaintiff's advantage not to hold the security after filing suit if he wants to be sure of being made whole." III Loss at 1728.

This scheme for measuring damages is further complicated by several other provisions. The first, previously mentioned, allows the defendant to reduce his liability to the extent he can prove that the depreciation in value of the security was not caused by the particular omission or misstatement in the registration for which he is liable. The second provision limits the liability of any underwriter who did not receive some special benefit from the issuer to the total offering price of that portion of the issue underwritten by him and actually distributed, 15 U.S.C. § 77k(e). Presumably subject to these limitations, subsection (f) provides for joint and several liability among defendants, but gives defendants not guilty of fraud a right of contribution against any person who would have been liable if sued individually.

Certain elements of § 11 elicit preliminary observations. Because there is no privity requirement every purchaser has a cause of action against every underwriter, thereby eliminating any *LaMar* problem.[15] However, the statute's non-punitive, make-whole remedy is circumscribed by the limitation of each underwriter's liability to the aggregate offering price of shares he actually sold. As a result, all the defrauded purchasers can be "made whole" on their cause of action only when they succeed in bringing all of the underwriters to court.[16]

---

**15.** None of the parties to this case has raised the issue of whether or not any of the plaintiffs or members of the plaintiff class who were open market purchasers, as opposed to original issue purchasers, have a cause of action under § 11.

**16.** In many cases the depreciation in value of the security will be less than the offering price, therefore, less than all of the underwriters will be able to satisfy the claims of all the purchasers. It is also possible the purchasers might be "made whole" by one of the other groups of

In another vein, the protective mantle of limited liability is juxtaposed against the statutory right of contribution. Even if the sections are read together so as to limit any one underwriter's contribution to his aggregate offering, the possibility remains that an underwriter may be called upon to ante-up his share of a judgment in an action of which he had no notice and be precluded from relitigating all issues save, perhaps, his personal defense.[17] From the underwriter's perspective, then, it would seem preferable, where suit is inevitable, to be before the court as a party or a class member than simply to be held accountable after the fact.[18] Finally, since joint and several liability is not coupled with punitive damages, class adjudication under § 11 does not pose the specter of martyrdom so worrisome to the Ninth Circuit in *Kline.*

The most perplexing aspect of underwriters' § 11 liability reposes in the due diligence defenses. Only one reported case has considered the § 11 defenses in any detail, and that case, *Escott v. BarChris Construc-* *tion Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968), has spawned wide public comment. *See, e.g.,* M. P. Dooley, *The Effects of Civil Liability on Investment Banking and the New Issues Market,* 58 Va.L.Rev. 776 (1972) [hereinafter cited as Dooley]; E. L. Folk III, *Civil Liabilities Under the Federal Securities Acts: The BarChris Case,* Part I—Section 11 of the Securities Act of 1933, Part II—The Broader Implications, 55 Va. L.Rev. 1, 199 (1969) [hereinafter cited as Folk, Part I or Part II]; Note, *BarChris: Due Diligence Defined,* 68 Colum.L.Rev. 1411 (1969); Note, *The Role of Contribution in Determining Underwriters Liability Under Section 11 of the Securities Act of 1933,* 63 Va.L.Rev. 79 (1977) [hereinafter cited as *Role of Contribution*]. In the *BarChris* case there were only nine underwriters, and all of them were parties to the action. Reasoning that prospective investors rely upon the reputation of the underwriters in deciding whether to purchase the securities, the court held the underwriters to a high standard of care, 283 F.Supp. at 696–97.[19] The

individuals subject to suit under § 11 that was also found liable and remained financially solvent.

**17.** The right of contribution gives *stare decisis* effect to the first judgment rendered where separate actions are prosecuted under § 11 involving the same registration statement. The absence of any *stare decisis* effect was relied upon by the Ninth Circuit in decertifying the class in *LaMar v. H&B Novelty & Loan Co.,* 489 F.2d 461, 467 (9th Cir. 1973). *See also United States v. Truckee-Carson Irrigation Dist.,* 71 F.R.D. 10, 17 n.5 (D.Nev.1975); *Mudd v. Busse,* 68 F.R.D. 522, 530 (N.D.Ind.1975).

**18.** Theory is often different than reality, and where, as here, the underwriters have pooled their risks, each underwriter probably would prefer an after the fact accounting since his presence before the court would only increase the amount of the aggregate syndicate risk.

**19.** Professor Folk has expanded upon the *Bar-Chris* court's somewhat cursory analysis as follows:

Indeed, there are several reasons why the underwriters should have, next to the issuer, the highest measure of responsibility for the integrity of the registration statement.

First, in the general industry view, underwriters vouch for the quality of the issuer. In some measure, the reputation of a good firm is staked on each issue it underwrites.

Moreover, the standing of the underwriter probably influences many investors, since they may reasonably assume that a house of outstanding reputation will not take on a "cat-and-dog" issue. Thus, the commonly accepted norms of the investment community imply that the underwriter regards the issue as suitable for public ownership, that the underwriter has assured itself that the issuer meets the firm's standards, and that its investigation has included "a complete review and analysis of the financial statements of the issuer for a considerable period in the past" and has gone "behind such statements to appraise the true value of the assets shown."

Secondly, underwriters are in a uniquely advantageous position to thoroughly investigate and verify the facts concerning an issuer. They are professionals who frequently have long experience in the field; indeed, they usually have more accumulated expertise than most issuers who make one-shot or intermittent offerings. Besides competence in a specialized area, underwriters also have the staff and facilities that are needed to assume such responsibilities. Since they are especially compensated for these resources, they have a duty both to the issuer and to the public to assure the integrity of the registration statement.

Another reason for imposing a duty of investigation on underwriters is that they have

lead underwriters were held liable because they had failed to make a reasonable investigation, and the participating underwriters, who had made no independent investigation of their own, we were held liable both for their failure to conduct an investigation and for the lack of a reasonable belief in the truth of the prospectus, 283 F.Supp. at 696–97. The court specifically refrained from considering whether the participating underwriters would have been immunized if the lead underwriter had made a reasonable investigation, 283 F.Supp. at 697 n.26.

Whether participating and lead underwriters will be held to the same standard of care and whether participating underwriters may delegate any or all of their investigatory responsibility to the lead underwriter are open questions. Professor Folk, argues on the basis of industry practice and public policy, that the cornerstone of due diligence lies in the activities of lead underwriter; therefore, participating underwriters should be allowed to delegate to the lead underwriter their investigatory responsibility. His rationale is quoted at length:

> In accordance with industry practice, participating underwriters count on the lead underwriter to immunize them from section 11 liabilities by satisfying the requirements of the 1933 Act. This is not unreasonable, since chaos would prevail if each underwriter participated in the investigation and tried to verify the accuracy of the registration statement. The underwriters would spend all of their time writing inquiries, posing questions, holding diligence meetings and generally doing everything but trying to market the securities. Even if the participating underwriters specially designated one of their number to do this job, it would be a costly and usually pointless duplication of the efforts which the lead underwriter should undertake.

. . . . .

*BarChris* did not decide whether participating underwriters are immunized from liability by the lead underwriter's conduct of an adequate investigation, but it seems reasonable to allow all to benefit from this. The congressional purpose of protecting investors is largely accomplished if the lead underwriter makes a satisfactory investigation. Although supplementary, independent inquires by the participating underwriters might occasionally dredge up an additional misstatement, the margin of improvement probably would not warrant the expense and confusion of proliferating inquiries. Such a

---

> great flexibility and discretion regarding the final acceptance of an issue. They have a natural incentive to continue their investigation until the eve of the registration statement's effectiveness since they incur no contractual obligations until that time, and even up to the closing may still have options whereby they can escape the underwriting contract. . . .
>
> *The underwriter's importance in preparing the issue for market confirms his responsibility to insure the accuracy of the registration statement.* He plays an important, often decisive, role in pricing the offering. He uses his position in the investment community to form a sufficiently large syndicate to market the securities as rapidly as possible. In the past, he has often insisted upon putting one or more of his nominees on the board of directors of a company whose securities he has underwritten. He may take a significant position in the issuer's securities, sometimes as a form of non-cash compensation. He has the power to withhold from public availability parts of a "hot issue" for his own personnel, their families and favored customers. He may or may not decide to "make a market" in the securities of the issuer, but if he does he will likely be the dominant force in trading the securities. Given this measure of authority, the underwriter is properly required to use his influence to cleanse the registration statement of misstatements and omissions before it goes to the public.
>
> *All of the foregoing considerations point to* the conclusion that the underwriter is uniquely able to adopt an objective or even adverse posture towards the issuer regarding the accuracy of the registration statement. In fact, his economic self-interest in escaping liabilities should long ago have prompted the adoption of such an exacting approach. There is no reason why there should be the slightest reluctance for underwriters to probe the issuer, even to the point of rudeness, and to insist upon documentary evidence to support all material representations in the registration statement. Folk, Part I at 54–56 (footnotes omitted).

quest of the perfect prospectus would not be worth the effort. If it is thought that investors deserve better safeguards than the law now affords them, the problem should be handled by a statutory amendment that either requires governmental investigation and approval of proposed new issues or exacts a strict guarantor's liability of all underwriters. . . .

Legislative history does not imply a different result. Thus, the Conference Report recognizes that the "fiduciaries" subject to civil liabilities need not personally perform each of their statutory duties, "[e]specially . . . where the character of the acts involves professional skill or facilities not possessed by the fiduciary himself." Since this language is not confined to directors, it can be read to allow participating underwriters to delegate investigatory functions to a lead underwriter who coordinates all dealings with the issuer. . . .

In conclusion, all members of the underwriting syndicate should be protected if the lead underwriter treats the issuer at arms length and verifies all material elements in the registration statement. If, despite his exercise of the high degree of diligence and care appropriate for an underwriter's investigation, an untruth still lurks in the shadows, all underwriters should enjoy the defense of a "reasonable investigation" leading to a "reasonable ground of belief" in the accuracy of the registration statement. Folk, Part I at 56–38 (footnotes omitted).

Following a slightly different approach than the *BarChris* court and Professor Folk—an approach that predicates participating underwriter's liability on the diligence of the managing underwriter—the Securities and Exchange Commission has outlined a separate duty for participating underwriters. The double-checking role envisioned by the Commission is described as follows:

The participating underwriter's reasonable investigation may not be as heavy a burden as that of the managing underwriter's [sic] and, in making a reasonable investigation, the participating underwriter need not duplicate the investigation made by the manager. The participant may delegate the performance of the investigation to the manager.

Even though the participant may appoint the manager as his agent to do the investigation, it is important to understand that the delegation to the manager and the subsequent reliance on his investigation must be "reasonable in light of all the circumstances." This means that the participant may relieve himself of the task of actually verifying the representations in the registration statement, but that *he must satisfy himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager.* SEC Act of 1933 Rel.No. 5275, at 11–12 (July 26, 1972) (footnotes omitted and emphasis added).

While the two approaches may be different in theory, the particular one chosen is likely to be of little consequence. Both recognize it would be unreasonable in most circumstances to require each of the participants to conduct the kind of thorough investigation needed to produce a cleansing of the registration statement. Once it is accepted that participating underwriters may delegate investigatory duties to the managing underwriter the primary focus of inquiry becomes, "What did the manager do?" and "Was it reasonable under the circumstances?"

Professor Folk would extend the *benefit* of the manager's due diligence to the participants no matter what they had done, whereas the Commission, theoretically, might penalize the participant who failed to double check the diligent manager's methods. The later course would produce an absurd result, however, since it would hold the participant liable for failure to investigate the manager's methods, which if he had done so would have proven to him that the manager had acted with due diligence.

On the other hand, none of the interpretations suggests the participant should be absolutely liable for the *failure* of

the managing underwriter. The defense under § 11 is a personal one and each participant is entitled to assert it for what it is worth. All the same, if the managing underwriter did not act with due diligence, the participant will be hard pressed to exonerate himself. Either he must show that he conducted a reasonable investigation of the registration statement (which he probably was not in a position to have done) or a reasonable investigation of the manager's methods. If he elected to investigate the manager's methods he faces the unenviable task of demonstrating how his investigation failed to uncover the manager's lack of diligence, except, of course, where the participant has been the victim of the manager's fraud.

This lengthy appraisal of § 11 demonstrates, among other things, that the interests of the managing and participating underwriters are nearly identical. All of the underwriters are exonerated if the registration statement is proven to contain no material misrepresentations or if the plaintiff is proven to have purchased the security with knowledge of any material misrepresentation; and if neither of these defenses is successful, proof of the due diligence of the managing underwriter will most likely exonerate the participants as well. It is only after the managing underwriter is found culpable that the interests diverge in separate defenses.

### Rule 23 Requirements

Having considered the issues to be tried in a § 11 cause of action the final question is whether the specific requirements of Rule 23 are satisfied in this case.

### Numerosity

■ Defendants do not seriously dispute that the familiar requirement, "the class [be] so numerous that joinder of all the members is impracticable," Fed.R.Civ.Proc. 23(a)(1), is satisfied by the ninety-one member proposed class. While one defendant class has been certified with as few as thirteen members, *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 53 F.R.D. 531 (D.N.

H.1971), one of the two reported securities cases denying certification of a defendant class of underwriters did so because the class of thirty-seven was not too numerous to join, *Guarantee Insurance Agency v. Mid-Continental Realty Corp.*, 57 F.R.D. 555 (N.D.Ill.1972). When the number of parties to be joined reaches the point of eliminating individual influence over pleading, discovery and litigation strategy then joinder cannot be considered a reasonable alternative to class adjudication. This is such a case. The only way this court could join ninety-one new parties would be to require that the litigation be conducted through committees, that is, to make joinder a fiction for class adjudication.

### Commonality

■ Looking to the allegations of the complaint and answers in this case it is evident that the proposed defendant underwriter class is knit together by common questions of fact. The central issue in this cause of action is whether or not the registration statement contained a material misrepresentation. Other common questions of fact include whether the plaintiffs purchased with knowledge of any material misrepresentation and whether the managing underwriters exercised due diligence in their investigation of the registration statement. Therefore, the commonality requirement of subsection (a)(2) of Rule 23 is satisfied by the proposed class.

### Typicality

■ The § 11 defenses, discussed above, have been asserted by the representative parties, and they are, by the statute's definition, typical of those which every underwriter might assert. In a legal sense the defenses of all the underwriters are identical; in a factual sense there is one difference. While all the underwriters will assert that the managing underwriters acted with due diligence, none of the underwriters will defend themselves on the basis that another participating underwriter acted with due diligence. What this distinction evidences is that the managers' diligence is a class

question, but the participant's diligence is an individual one. Nonetheless, the typicality requirement of subsection (a)(3) is easily satisfied by the otherwise identical defenses of the class members.

*Adequacy*

■ The one Rule 23(a) requirement defendants strongly dispute is satisfied by the named representatives in this case is the requirement that they "fairly and adequately represent the interests of the class." Courts attempting to articulate a standard for Rule 23(a)(4) commonly have focused upon two basic factors—the assurance of vigorous prosecution and the absence of conflict. 1 Newberg at 196. It is presumed that representatives will vigorously prosecute or defend the action if they have retained well qualified counsel and if they possess sufficient resources or stake in the outcome of the case to bear the financial burden of litigation. On the other hand, while their interests need not be coextensive with those of the class, representatives are considered inadequate if any of their interests are seriously antagonistic to those of the class. The Ninth Circuit has recently explained the manner in which potential conflicts must be examined.

> The due process touchstone of adequacy and fairness of representation . . . must be judged in light of the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented. *Blackie v. Barrack,* 524 F.2d 891, 910 (9th Cir. 1975).

■ Plaintiffs have named as representatives in this action the two managing underwriters, Merrill Lynch and Lehman, and one participating underwriter, Bacon. Merrill Lynch and Lehman collectively underwrote 25% of the Gap issue, or 154,000 shares each at the offering price of $18.00 per share. By way of comparison, Bacon underwrote only 5,000 shares of which it actually sold 2,295. As one might discern from this information alone, the managing underwriters are natural representatives but Bacon is not.

Bacon was named in this action to preclude potential conflicts between the managing and the participating underwriters from preventing class certification. However, this manner of protecting sub-group interests makes no sense where the participating underwriters are, in reality, the entire class. Furthermore, Bacon is an inadequate class representative for several reasons. First, its maximum liability under § 11 could not exceed $42,000, and the cost of litigating the defense of all the underwriters certainly would exceed that amount. With so little stake in the outcome of the litigation Bacon might prefer to admit liability than defend on the merits. Second, Bacon is located in Chicago, with no apparent connections to this district so that litigating here would work a considerable hardship. If the court believed it was appropriate to randomly pick a participating underwriter as a class representative, fairness would dictate the selection of a local underwriter, and not one situated half way across the country. Finally, Bacon has relied on Merrill Lynch and Lehman to oppose this motion for class certification, a likely indication that even if Bacon were certified as a class representative, Merrill Lynch and Lehman would continue to finance and control the class defense. For these reasons Bacon cannot be considered an adequate class representative.

■ Merrill Lynch and Lehman assert they are inadequate class representatives because the limitation of their liability under § 11 to the shares they underwrote deprives them of any incentive to represent the interests of the participating underwriters. Plaintiffs counter with the argument that every underwriter has a monetary stake in the defense of every other underwriter because each has previously agreed to pay his pro rata share of any judgment entered against any other underwriter. To this argument Merrill Lynch and Lehman respond that only the participating under-

writers are so obligated; the Agreement does not commit the managing underwriters to pay their pro rata share of liability incurred by participants.[20] All this debate about individual versus shared liability, however, somewhat misses the point. Courts cannot depend on private agreements to provide the coincidence of interest sufficient to satisfy the requirements of due process. This is particularly true where such private agreements for contribution and indemnification might not be enforceable if they were found to undermine the deterrent effect of a particular statute. *See, e. g., Role of Contribution.* The essential point is whether Merrill Lynch and Lehman, in defense of themselves, will automatically defend the participants because their interests are identical. This conclusion has already been reached.

The next argument made by the managing underwriters is that, for the same reasons of limited liability, they have no interest in litigating the participating underwriters individual due diligence. The simple answer to this argument is that class representatives never have an interest in litigating individual issues, nor are they so obligated.

Flipping the coin to the other side, Merrill Lynch and Lehman assert they are inadequate representatives because their stake in the litigation is so great. In other words, because they have a paramount interest in protecting their reputations and because their combined potential liability exceeds five million dollars, their strategy for the litigation will be different than that of the participants with much less at issue. However, compromise over litigation strategy is an inevitable consequence of class actions. Precisely to protect against unfair compromises, Rule 23(e) requires a hearing and court approval of any settlement of class claims.[21] Conversely, if it develops that the

class representatives are refusing advantageous settlement the court retains numerous powers to protect the interests of the class, the least of which is decertification. For these reasons the size of the managing underwriters' stake in this litigation does not make them inadequate representatives.

The final argument of the managing underwriters is that class certification is inappropriate because irreconcilable conflicts divide the class. Specifically, they point to the statutory provision for joint and several liability and argue that the managing underwriters have an interest in bringing into this litigation as many underwriters as possible to share the liability. Merrill Lynch and Lehman also assert that because § 11(f) denies a right of contribution to any underwriter guilty of fraud each underwriter will wish to prove every other underwriter acted in a fraudulent manner.

It is not uncommon for conflicts to arise within *plaintiff* classes once liability has been adjudged and class members must compete for distribution of the damages. However, as the Ninth Circuit recently observed in *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir. 1975), "[c]ourts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *See also* 1 Newberg at 204–05. It is equally apparent that conflicts might arise in a *defendant* class once liability has been determined, particularly where, as under § 11, the statute anticipates apportionment of damages according to responsibility. The simple way of avoiding these conflicts, however, is to determine apportionment of damages in a separate proceeding.

By way of conclusion, Bacon is not an adequate representative, but Lehman and

---

20. The specific language of the Agreement is, "[w]e [the participating underwriters] agree to pay . . . our proportionate share of aggregate liability incurred by all underwriters in respect of such claim . . . ."

21. One meritorious argument advanced by the managing underwriters is that adherence to the

majority rule settlement provision of the Agreement Among Underwriters might violate the standards established by the Ninth Circuit in *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832, 835–36 (9th Cir. 1976) for settlement of a class action.

Merrill Lynch are adequate representatives. Both managing underwriters will vigorously prosecute this action because they have a substantial interest in the outcome of the litigation and because they are represented by able counsel. Furthermore, the potential conflicts will not defeat class certification. Using the *Blackie* analysis, the conflicts are insignificant when compared with the issues uniting the class and can be eliminated by a separate proceeding when, and if, liability is adjudged.

*Predominance and Superiority*

Plaintiffs seek to certify the defendant underwriters as a (b)(3) class. Certification under this section requires the court to find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy." Rule 23 further advises the court in making this determination to consider: the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; the difficulties likely to be encountered in the management of a class action. Although common questions must predominate they need not be dispositive since Rule 23(c)(4) contemplates maintenance of a class with respect to particular issues. *See, e.g., Arthur Young & Co. v. United States Dist. Court,* 549 F.2d 686, 693 n.10 (9th Cir. 1977); *Guy v. Abdulla,* 57 F.R.D. 14, 16 (N.D.Ohio 1972); *Research Corp. v. Pfister Asso. Growers, Inc.,* 301 F.Supp. 497, 502–03 (N.D.Ill.1969).

As noted above, the only individual issues arising under § 11 are the participating underwriters due diligence. But, as also noted above, the participants' liability hangs heavily upon the conduct of the managers and is determined most efficiently only after the manager has been found culpable. In this circumstance it is fairly apparent common questions predominate and a class action is superior.

The participating underwriters lose control over the litigation but they gain the enormous economies of a group defense. The unconscionable expense of filing and serving ninety-one individual but identical answers is avoided. Also avoided is the cost of discovery relevant to each participant's due diligence, unless and until the manager's liability has been determined. On the other hand, class members have an opportunity to monitor the litigation and to raise a voice in its settlement which sweetens the bitter pill of contribution.

Significant judicial economies are achieved by one rather than ninety-one determinations of such common questions as whether the registration statement contained a material misrepresentation, even though this court may be faced with ninety-one separate determinations of participant due diligence. Only the facts will show how time consuming and manageable these individual determinations will be, however, it is plausible to surmise that a majority of the participants performed their statutory duties in exactly the same way, as for example, by attending a "due diligence meeting" called by the managers. Such a common course of conduct will simplify trial, but it will not eliminate the right of each participant to assert his individual defense before the trier of fact. *See Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 236 n.8 (9th Cir. 1974).[22]

The primary problem with a (b)(3) defendant class is the members' right to opt out. The prospect of an entire class excusing itself from suit has caused some courts

---

**22.** If the class issues are tried before a jury it is possible the individual issues might be tried before a different jury. Such a result would not offend the Constitution. "As long as the form of trial adopted by the trial court 'will afford opportunity for the consideration by the jury' provided at common law, there is no violation of the right to a jury trial." *Arthur Young & Co. v. United States Dist. Court,* 549 F.2d 686, 693 (9th Cir. 1977).

to conclude subdivision (b)(3) is not suited to defendants' classes. *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 238 (9th Cir. 1974) (Duniway, J., concurring); *Guy v. Abdulla,* 57 F.R.D. 14, 17 (N.D.Ohio 1972). *See also* 1 Newberg at 254–56. To discourage opting out, one commentator has suggested that those who excuse themselves from the class should not be permitted to assert collateral estoppel in the event the plaintiff loses the class action. *Defendant Class Actions* at 635. However, such a limitation is beyond the power of the certifying court.

In the instant case, the plaintiffs have provided their own disincentive for opting out. One of the plaintiffs on his own and twelve plaintiffs as a group have filed suit in this district naming the participating underwriters individually. Any underwriter who opts out of this class will undoubtedly be served in one or both suits. While one of the suits is limited to § 11, the other alleges a full panoply of securities violations. Thus, the opting class member would not only bear the expense of his own defense, but also face potential liability unlimited by the restrictions of § 11. For this reason it appears likely a majority of the class will not opt out.

Having previously determined the four requirements of Rule 23(a) are satisfied, and here finding that common questions predominate and a class action is the superior method of resolving the controversy under § 11, the court concludes the alleged underwriter class represented by Merrill Lynch and Lehman is a proper (b)(3) class. Satisfaction of the requirements of Rule 23 has been considered at this point because, as is set forth more fully below, the class cannot be maintained with respect to the fourth and fifth counts of the complaint.

*Count Four—§ 12(2) of the Securities Act of 1933*

Count Four of the complaint alleges a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, a measure which was adapted from the common law equitable remedy of rescission.[23] Unlike § 11 which applies only to the sale of registered securities, § 12(2) applies to the sale of all securities, registered and unregistered, and finds its constitutional nexus in the utilization of a facility of interstate commerce. The statute provides that any person who offers or sells a security, "by the use of any means or instruments of transportation or communication or of the mails, by means of a prospectus or oral communication," which includes a material misrepresentation shall be liable to the person purchasing the security from him.

As with § 11, the familiar elements of *reliance, causation* and *scienter* are absent; although causation enters to the degree that the plaintiff must prove his own ignorance of the untruth or omission. Unlike § 11, § 12(2) provides one simple defense—a seller may exonerate himself if he sustains the burden of proof "that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." Upon tender of the security, the defrauded purchaser is entitled to the consideration paid plus interest and minus income received. If the purchaser no long-

---

**23.** 15 U.S.C. § 77*l* (1971) reads in full:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provision of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

er owns the security, he may sue instead for compensatory damages.

█ In an original issue case, such as this one, §§ 11 and 12(2) overlap, and the same alleged misrepresentation in the prospectus may be used to frame dual causes of action against all selling underwriters. However, as Professor Loss has observed, the remedies are not cumulative. "The purchaser of a registered security, whether from the issuer directly or from an underwriter or dealer, presumably cannot rescind the transaction under § 12(2) and at the same time retain his status as a security holder in order to sue for damages under § 11." III Loss at 1700 n.46. Even though this interpretation requires the plaintiff to elect his remedies, nothing in § 12(2) explains when or how tender is to be accomplished. Therefore, it is reasonable to assume that the plaintiff may pursue both remedies to judgment, electing his choice at the last possible moment.

The most significant aspect of § 12(2) for purposes of this discussion, however, is found in the *privity* requirement. According to Professor Loss: "[I]t seems quite clear that § 12 contemplates only an action by a buyer against *his immediate seller.* There is to say, in the case of the typical 'firm commitment underwriting,' the ultimate investor can recover only from the dealer who sold to him. But the dealer in turn can recover over against the underwriter and the latter (with some caveat by reason of the 'preliminary negotiations' clause of § 2(3)) against the issuer; . . ." III Loss at 1719 (footnotes omitted). Some courts have given a more expansive reading to § 12(2) by extending liability to persons who "participated" in the sale. *Lennerth v. Mendenhall*, 234 F.Supp. 59 (N.D.Ohio 1964); *Zachman v. Erwin*, 186 F.Supp. 691 (S.D.Tex.1960). Such an interpretation, however, necessarily introduces a requirement of causation, that is, the "participant" must have caused the sale. Folk, Part II at 203–04.

█ If § 12(2) is given a strict reading, the Ninth Circuit's holding in *LaMar v. H&B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), plainly precludes certification because all of the named plaintiffs do not have a cause of action against all of the members of the defendant class. On the other hand, if § 12(2) is read more expansively, each participating underwriter must be shown to have caused each of the sales simply by his membership in the underwriting syndicate. An affirmative conclusion would be the expedient way of preserving a § 12(2) cause of action for the plaintiffs, but it would work precisely the kind of injustice envisioned by the Ninth Circuit in *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974). None of the individual underwriters would have their liability limited to the shares they actually sold, and the aggregate underwriter liability might well exceed the total value of the underwriting if open market and original issue purchasers were all allowed to rescind their purchases or obtain compensatory damages. While the court is not powerless to prevent an unjust apportionment of damages, there is no substantial reason to certify a defendant class with respect to § 12(2) when plaintiffs would be compelled to elect between § 11 and § 12(2) at some point anyway.

Because *LaMar* and *Kline* preclude certification of a defendant underwriter class with respect to § 12(2) the court need not ascertain whether the requirements of Rule 23 are otherwise satisfied.

### Count Five—§§ 25401, 25501, 25504 of the California Corporations Code

█ All that has been said above about § 12(2) applies with equal force to the pendent state claims since they are based on California statutes specifically modeled after § 12(2). California Corporations Code § 25401 makes it unlawful for any person to offer or sell a security in California by means of any written or oral communication containing a material misrepresentation.[24] Section 25501 gives the defrauded purchaser a cause of action against the sell-

---

**24.** California Corporations Code §§ 25401, 25501, and 25504 provide as follows:

§ 25401. Sale or purchase of securities by means of written or oral communications

er for rescission or compensatory damages, and § 25504 makes controlling persons and aiders and abettors jointly and severally liable for a violation of § 25501.

There is an additional reason why certification is inappropriate under the state claim. A large percentage, if not the majority of "offers" and "sales" of Gap stock did not take place in California, and the statute by its own terms is limited to transactions with a California nexus. Simply because California law may be properly applied to the class representative does not mean it can also be applied to the participating underwriter from Alabama who confined his offers and sales of Gap stock to the state of Alabama. To do so would be to apply the law of California beyond the limits of its sovereignty.

## CONCLUSION

■ Certification of a defendant class of underwriters with respect to count Three

of the complaint does not offend due process. Each class member will receive notice of the pendency of this action and information regarding his right to opt out. Furthermore, litigation in this forum is not fundamentally unfair to absent class members because § 22(a) of the 1933 Securities Act, 15 U.S.C. § 77v(a), and § 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa places venue in this district and any underwriter, properly served, might be sued here without regard to his general contacts with the forum. The public policy behind the securities laws is vindicated by permitting the purchasers of Gap stock to pursue their claim against all of the underwriters, while the limitation of the class action to § 11 protects class members from potential liability vastly disproportionate to their individual responsibility. Finally, and not insignificantly, the court benefits from the economies of a narrowly limited and manageable class action.

containing false statements or omissions It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

§ 25501. Violation of section 25401; suit for rescission or damages; defense
Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission. Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security. Upon rescission, a seller may recover the security, upon tender of the consideration paid for the security plus interest at the legal rate, less the amount of any income received by the defendant on the security. Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff. Damages recoverable under this section by a seller shall be an amount equal to the difference between (1) the value of the security at the time of the filing of the complaint plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold plus interest at the legal rate from the date of sale. Any tender specified in this section may be made at any time before entry of judgment.

§ 25504. Joint and several liability of other persons, partners, etc., with persons liable under sections 25501 or 25503
Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.