**In re ACTIVISION SECURITIES LITIGATION, and All Related Actions.**

**No. C–83–4639–MHP.**

United States District Court,
N.D. California.

Nov. 4, 1985.

William S. Lerach, John E. Grasberger, Kristin M. Cano, Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, Cal., Leonard Barrack, Gerald J. Rodos, Kirk Hulett, Barrack, Rodos & Bacine, Philadelphia, Pa., Arthur N. Abbey, Abbey & Ellis, New York City, for plaintiffs.

Richard D. Greenfield, Carole A. Broderick, R. Bruce McNew, Greenfield, Chimicles & Lewis, Haverford, Pa., David B. Gold, Paul F. Bennett, John W. Allured, San Francisco, Cal., Malcolm E. Wheeler, David A. Lombardero, B. Erin Ruderman, Hughes Hubbard & Reed, Los Angeles, Cal., for Coopers & Lybrand.

Tower C. Snow, Gilbert R. Serota, Eric K. Hansen, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for Activision, Inc., Allan Epstein, Robert K. Faught, Harvey N. Gillis, James H. Levy, John M. Lillie, Frank A. Mainero, Richard W. Muchmore, Thomas W. Pomeroy and Arthur F. Schneiderman.

Patrick J. Mahoney, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for Genstar Pacific Corp., Sutter Hill Ventures, Paul M. Whythes and David L. Anderson.

John N. Hauser, Philip R. Rotner, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Robert F. Wise, Jr., Henry King, Davis, Polk & Wardwell, New York City, for Morgan Stanley & Co., Inc. and L.F. Rothschild Untergerg Towbin.

## AMENDED MEMORANDUM DECISION AND ORDER

PATEL, District Judge.

This action is a consolidation of four proposed shareholder class actions arising from the public offering of Activision securities in June 1983. Activision is a Silicon Valley company founded in 1979 to design, manufacture, and market video game cartridges. Its products were compatible with the Atari 2600 and the Mattel Electronics Intellivision systems. The company enjoyed phenomenal success in its first years of operation, reaching sales of over $157 million in its fiscal year ending March 1983. Five of its video game titles sold over a million and fifteen titles sold over 50,000 during this period.

Activision went public on June 9, 1983. The company and a number of its shareholders sold four million shares at $12 per share through a syndicate of underwriters

on a "firm commitment" basis. Three months after the public offering Activision revealed that it expected a pre-tax loss of $6–10 million. Following this disclosure the price of the stock declined to $6 per share and has traded since then at less than $2 per share.

Plaintiffs in this action are four investors who purchased Activision securities pursuant to the public offering: Blumenfeld, who bought 1000 shares from E.F. Hutton; Weinberger, who bought 100 shares from L.F. Rothschild, Unterberg, Towbin ("Rothschild"); Cadelago, who bought 1000 shares from Rothschild, 1000 shares from Shearson/American Express, Inc., and 100 shares from Drexel Burnham Lambert, Inc.; and Rowland, who bought 1000 shares from Rothschild. Rowland bought an additional 1000 shares from Rothschild in September 1983.

The plaintiffs allege that defendants knew that the video game industry in general and Activision in particular were experiencing difficult financial conditions at the time of the public offering but failed to disclose this information in the Registration Statement and Prospectus. Plaintiffs claim, for example, that at the time of the public hearing Atari and Intellivision were suffering losses and losing their shares of the market. In addition, Christmas 1982 was a "disaster" for the industry, resulting in bloated inventories for retailers, distributors, and manufacturers. As a result, prices of video games were reduced and Activision established a policy allowing retailers to return up to one-half of their unsold inventory. Further, plaintiffs claim that at the time Activision went public 20 percent of the 30 game titles it had actively marketed were earmarked for "de-listing," meaning that the company would stop marketing the games and would buy back the unsold inventory.

Plaintiffs allege that despite these warning signs defendants' Prospectus disclosed no more than that business was slow, claiming the problem was temporary and Activision's prospects were bright. The Prospectus predicted that sales for the first half of fiscal year ("FY") 1983 would match sales for the first half of FY 1982 and that sales in the second half of FY 1983 would exceed sales of the second half of FY 1982. Plaintiffs contend that but for this "groundless hyping" of the stock, defendants could not have commanded the $12 per share of Activision they charged the public.

Plaintiffs bring various federal and state securities and common law claims against numerous defendants. The defendants break down into four groups: (1) "Activision" defendants (Activision and its officers and directors); (2) "underwriter" defendants (co-lead underwriters Morgan Stanley & Co. ("Morgan Stanley") and Rothschild); (3) "accountant" defendant (Coopers & Lybrand), and (4) "venture capital" defendants (a group of investors and one director who sold a portion of their shares to the underwriters at the time of the offering). Claims are brought pursuant to §§ 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, and 77o; §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b–5 promulgated thereunder; Cal. Corp.Code §§ 25400 and 25401; and common law claims of fraud, deceit, and negligent misrepresentation.

Several motions are now before this court. Three separate groups of defendants have moved to dismiss a number of the claims against them. In addition, plaintiffs have moved for certification of a plaintiff class and a defendant underwriter class for adjudication of the §§ 11 and 12(2) claims. The court has carefully reviewed the parties' extensive papers and has heard oral argument. For the reasons set forth in Part I of this order, defendants' motions are granted in part and denied in part. For the reasons set forth in Part II, plaintiffs' class certification motions are granted in part and denied in part.

*Discussion*

## I. MOTIONS TO DISMISS

Defendants moved to dismiss a prior complaint pursuant to Fed.R.Civ.P. 9 and

12(b)(6). In an order filed September 20, 1984 ("Order") Judge Orrick upheld many of plaintiffs' allegations, dismissed others with leave to amend, and dismissed some with prejudice.[1] Plaintiffs filed their Second Consolidated Amended Complaint ("amended complaint") on October 22, 1984. Defendants have filed three separate motions to dismiss various portions of this complaint.

Plaintiffs argue that Judge Orrick's rulings are binding on this court as "law of the case" absent clear error or superseding changes in the law. This argument appears disingenuous inasmuch as plaintiffs cite the law of the case doctrine when they agree with Judge Orrick's rulings and ignore it when they disagree. This court's interpretation of the doctrine is that it is useful as a guiding principle but does not limit the court's power to reconsider a prior ruling. *Russell v. C.I.R.*, 678 F.2d 782, 785 (9th Cir.1982) ("The doctrine does not limit [a court's] power to reexamine an earlier decision; rather, it is a voluntary limitation.")

### A. *Activision Defendants' Motion* [2]

#### 1. *Section 12(2)*

Section 12(2) of the Securities Act of 1933 provides that

> any person who offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him.

15 U.S.C. § 77*l*. The Activision defendants challenged plaintiffs' first complaint on the ground that they were not "sellers" of securities under the Act because the Activision stock was sold to plaintiffs through the underwriters rather than by them.

Judge Orrick analyzed defendants' "seller" status using a "substantial participation" test. He dismissed plaintiffs' § 12(2) claims against these defendants with leave to amend because plaintiffs did not adequately allege these defendants' substantial involvement in the sale of securities to plaintiffs. *Admiralty Fund v. Jones*, 677 F.2d 1289, 1294 n. 3 (9th Cir. 1982); *Hudson v. Capital Management International, Inc.*, [1983–84 Binder] Fed. Sec.L.Rep. (CCH) ¶ 99,222 at 95,903–04 (N.D.Cal.1982). Judge Orrick ruled that the activities plaintiffs invoked to give rise to § 12(2) liability—involvement in planning the offering, drafting the prospectus, and negotiating the price of the stock— were merely typical of what any corporation and its officers would engage in prior to a public offering. "Something more" is required to bring defendants within § 12(2). Order at 14.

Although the amended complaint adds new allegations regarding defendants' purported "seller" status, defendants move to dismiss it on the grounds that it contains insufficient allegations of involvement or participation by these defendants in any particular sale of securities to plaintiffs. For the reasons set forth below, the court agrees with defendants and dismisses the § 12(2) claims against them.

The Ninth Circuit has adopted the "substantial participation" test articulated in *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692–93 (5th Cir.1971) to analyze "seller" status under § 12. *Admiralty Fund*, 677 F.2d at 1294. Defendants argue that in *Feldman v. Simkins Industries, Inc.*, 679 F.2d 1299 (9th Cir.1982), the Ninth Circuit overruled *Admiralty Fund* and adopted a "strict privity" test. Judge Orrick rejected this argument on the ground that *Feldman* addressed an open market transaction rather than a public offering and did not even discuss the notion of "substantial participation." This court already has reached the same conclusion. *Deneau v. Walter*,

---

**1.** This case was reassigned to this court from Judge Orrick in September 1984.

**2.** Accountant defendant Coopers & Lybrand joins in this motion.

No. C–82–3132, slip op. at 3 (N.D.Cal. September 30, 1983). *Accord In Re Diasonics Securities Litigation,* 599 F.Supp. 447, 456 n. 9 (N.D.Cal.1984). It will continue to apply the "substantial participation" test.

■ In *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980), the court indicated that the question of whether defendants substantially participated in the sale of securities to the public so as to incur § 12 liability should be examined on a case-by-case basis. The test is one of proximate cause. *Hill York,* 448 F.2d at 692–93. A defendant is considered a substantial factor if he or she "actively solicits an order, participates in the negotiations, or arranges the sale." *Lawler v. Gilliam,* 569 F.2d 1283, 1288 (4th Cir.1978). This court has ruled that "seller status [has] to be predicated on actual participation in the selling process." *Hudson,* ¶ 99,222 at 95,904.

■ Plaintiffs' allegations in the amended complaint do not meet these standards. Indeed, the new claims hardly go beyond those Judge Orrick deemed inadequate as conduct typical of a corporation and its directors in any public offering. For example, plaintiffs allege as follows: defendants helped draft the Prospectus, participated in "road show" presentations of information to securities brokers and investment analysts, analyzed the market and set the price for Activision shares, and negotiated the agreement with the underwriters. Amended Complaint at ¶ 61. Even if all these allegations are true they are inadequate to impose liability under § 12(2).

The cases cited by plaintiffs in support of their claim evidence a great deal more participation by defendants in selling shares to investors than the instant case. For example, in *Securities and Exchange Commission v. Murphy,* 626 F.2d 633 (9th Cir. 1980), an enforcement case under § 5, 15 U.S.C. § 77e, defendant not only prepared and reviewed offering materials but also met personally with investors and spoke at broker-dealer seminars. The court in that case found that defendant played an "extensive role in facilitating the [sales] transactions." 626 F.2d at 652. The court distinguished between the substantial factor test under § 12 and the "necessary participant" test under § 5, ultimately concluding that "in practice, the standards differ little, for no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction." *Id.*

In *Hill York,* defendants "did everything but effectuate the actual sale." 448 F.2d at 693. They travelled to Florida to find the original subscribers for the corporation, they personally instructed these individuals as to how to solicit additional investors (including the nature of the "sales pitch"), and provided them with sales brochures. The difference between these cases and the instant one is not, as plaintiffs argue, merely that the former involved oral communication whereas this one involves written communication. Plaintiffs herein simply do not make similar allegations of personal participation.

Plaintiffs suggest that to deny § 12(2) liability in a situation such as this would insulate defendants from liability for their alleged wrongdoing in the public offering of Activision. Such is not the case. Plaintiffs' cause of action pursuant to § 11 of the Securities Act against these defendants remains.

Judge Orrick's order provided specific analysis regarding the deficiencies in plaintiffs' § 12(2) allegation and afforded them an opportunity to amend. Since plaintiffs still appear to be unable to allege facts sufficient to impose § 12(2) liability on these defendants the court concludes that they are unable to do so. Accordingly, the § 12(2) claim against them is dismissed with prejudice.

a. *Aiding and Abetting § 12(2)*

■ Plaintiffs offer another theory of liability as to these defendants, alleging they aided and abetted a violation of § 12(2). There is a serious question as to whether this circuit recognizes aiding and abetting liability for a § 12(2) claim. *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1311 n. 12 (9th Cir.1982) (reading

Supreme Court precedent as rejecting an expansion of the scope of the securities acts through application of tort and criminal theories.).

Secondary liability under § 12(2) could extend no further than the "substantial participation" test used to evaluate primary liability under this section. *Wright v. Schock*, 571 F.Supp. 642, 658 (N.D.Cal. 1983), *aff'd* 742 F.2d 541 (9th Cir.1984). To find otherwise would expand the parameters of § 12 liability beyond that contemplated by the courts in *Hill York* and *Admiralty Fund*. As the Fifth Circuit stated in *Pharo*,

> The panel in *Hill York* was faced with fashioning a test for determining which participants, out of the universe of possible participants, in a section 12 sale should be subject to liability as sellers. A test was developed ... In finding, under this test, that [defendant's] participation in plaintiffs['] transactions was insufficient to incur section 12 liability, we have in effect found that [defendant] could have no liability as aider and abettor.

*Pharo*, 621 F.2d at 669.

The "substantial participation" test thus reflects the outer limits of § 12 liability. This court refuses plaintiffs' invitation to extend its boundaries further by recognizing aiding and abetting liability. *Accord Diasonics*, 599 F.Supp. at 458 (finding aiding and abetting liability "would eviscerate the 'substantial participation' theory" set forth in *Admiralty Fund*); *Hokama v. E.F. Hutton*, 566 F.Supp. 636, 642 (C.D. Cal.1983) (distinguishing between participant and aiding and abetting liability and finding aiding and abetting liability unavailable under § 12(2).). *But see In Re Caesar's Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973) (viewing the expansion of primary liability under § 12 as justifying a finding of secondary liability

under that section.). Accordingly, this claim is dismissed with prejudice.

### 2. *California Corporations Code*

■ Count IV of the amended complaint charges Activision defendants with violating Cal.Corp.Code §§ 25400 and 25500 (West 1977). These statutory provisions apply only to "sellers" so that defendants not liable under § 12 are not liable under these provisions. *Hudson v. Capital Management International, Inc.*, 565 F.Supp. 615, 628 (N.D.Cal.1983). Inasmuch as plaintiffs have failed to allege facts adequate to impose § 12 liability on these defendants the court dismisses this count with prejudice.[3]

### 3. *New Allegations by Blumenfeld*

The amended complaint includes claims for alleged violations of §§ 11 and 12 of the Securities Act on behalf of plaintiff Blumenfeld that were not included in the prior complaint. Plaintiffs concede that these claims were omitted, albeit inadvertently. Defendants claim that amending the complaint to include them violated Fed.R.Civ.P. 15 because Judge Orrick granted only limited leave to amend. Defendants contend that the addition of Blumenfeld's claims prejudices them because all class discovery and certification motions proceeded on the assumption that such claims were asserted only by plaintiffs Weinberger, Cadelago, and Rowland. This contention is misleading; defendants spend several pages of their opposition to plaintiff class certification specifically addressing the adequacy of Blumenfeld to represent the plaintiff class. *See* Activision Defendants' Motion in Opposition to Plaintiff Class Certification at 35–40.

Rule 15 provides that "a party may amend his pleading ... by leave of court ... and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In *Foman v. Davis*, 371 U.S. 178, 180–81,

---

**3.** Judge Orrick concurred with the *Hudson* ruling and dismissed this count *with prejudice* against all but the underwriter defendants. Order at 21. The summary portion of the order apparently created some confusion since it indicated that this count was dismissed with leave to amend.

83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962) the Court ruled that since claims should be decided on the merits rather than on the basis of technicalities, courts should grant leave to amend liberally absent evidence of bad faith, dilatory motives, and undue prejudice.

■ Defendants' protestations to the contrary, the court finds no undue prejudice to them in allowing Blumenfeld's claims to remain in this action.[4] He is identically situated to the other plaintiffs, defendants have been on notice of his claims since he filed his original complaint in October 1983, and their challenges to his adequacy as a class representative have been considered by the court. The motion to strike these claims is denied.

### B. *Venture Capital Defendants' Motion*

#### 1. *Section 11*

Section 2(11) of the Securities Act defines an underwriter as one "who has purchased from an issuer with a view to ... the distribution of any security, or participates or has a direct or indirect participation in any such undertaking." 15 U.S.C. § 77b(11).[5] Plaintiffs seek to impose liability on these defendants as "statutory underwriters" because they allegedly purchased their Activision shares "with a view towards distribution" and "participat[ed] in the undertaking."

Judge Orrick stated that although plaintiffs alleged facts which could be developed to show that these defendants did purchase their Activision "with a view towards distribution," he nonetheless doubted whether a "statutory underwriter" theory could apply in a firm commitment underwriting situation such as the instant one. Order at 4. However, he did not reach the issue because he found these defendants secondari-

ly liable for violating § 11 under § 15 as "controlling persons."

Defendants argue that the court should address the "statutory underwriter" claim against them at this point because they are entitled to know whether they are liable to plaintiffs for a primary or secondary violation of § 11, particularly given that the defenses to the charges are different. The court agrees, and for the reasons set forth below dismisses the "statutory underwriter" claim against them.[6]

In *McFarland v. Memorex Corp.*, 493 F.Supp. 631 (N.D.Cal.1980), *modified on other grounds,* 581 F.Supp. 878 (N.D.Cal. 1984), plaintiffs sought to impose § 11 liability on certain warrantholders who sold warrants that gave them the right to purchase Memorex stock to underwriters. The underwriters exercised the warrants, bought the Memorex shares, and distributed the shares in the offering. As in this case, the offering was a firm commitment underwriting. Plaintiffs in *McFarland* alleged that the warrantholders were liable under § 11 because they "participated" in the offering. Plaintiffs premised this argument on the fact that the warrantholders received substantial profits from their sale of the warrants to the underwriters.

Judge Ingram thoroughly reviewed the legislative history of § 11 and it need not be restated here. Based on this history and the rationale for § 11 he refused to find that the warrantholders acted as underwriters as defined by the Securities Act. The warrantholders did not perform the functions of underwriters. For example, the warrantholders neither bore the risk of the sale of the shares to the public nor held themselves out to be experts able to evaluate the financial condition of the issuing company. 493 F.Supp. at 645–46. In addi-

---

**4.** Of course, Blumenfeld's § 11 and § 12 claims are subject to the rulings of this court on the motions to dismiss.

**5.** Defendants' argument that the statutory definition of underwriter excludes "members of the selling group" is misleading. The commentator is referring to the selling group of dealers with whom the underwriters contract to sell a por-

tion of the issue. It does not refer to shareholders who sell their shares to the underwriting syndicate. *See* 3 H.S. Bloomenthal, *Securities and Federal Corporate Law,* § 8.10 (1985).

**6.** Venture capital defendant Anderson remains liable under § 11 given his status as a director of Activision.

tion, the court found that since "[t]he warrantholders had *no* interest, direct or indirect, in the underwriting" they could not be deemed to have "participated" in it. *Id.* at 646. *Accord Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 536 (S.D.N.Y.1977) (participation in § 11 defined as participation in the "transmission process between the issuer and the public.")

The purpose of § 11 is to protect persons who purchase securities in the distribution process or on the open market from misstatements or omissions in the registration statements. Liability is fixed upon those who participate in the registration process. Issuers or management must assume primary responsibility for the information disseminated in the registration statement. Professionals and underwriters who participate in the preparation of the registration statement are liable subject to due diligence and reasonable investigation defenses. The reason for holding selling shareholders liable as statutory underwriters is to insure that if they participate in the distribution process they do not escape responsibility that would otherwise fix upon the underwriters.

█ Regulations were carefully constructed under the Securities Act of 1933 so that securities would not be released for sale to the public until the registration statement is effective and all the requirements for its preparation have been met. In a case of firm commitment underwriting, as here, all shares for distribution are purchased by the underwriting group for sale to the public. The Underwriting Agreement and Prospectus show that the purchase by the underwriting syndicate included the shares to be issued by the company and the selling shareholder shares. The selling shareholders do not participate in the distribution process by merely selling their shares to the underwriter. In their capacity as selling shareholders they do not participate in the registration statement process. On these facts no purpose is served in holding them liable under § 11.

Moreover, those cases that have broadly construed the definition of underwriters in

§ 11 have done so in contexts very different from the instant one, such as when a seller of an unregistered security is denied an exemption from liability pursuant to 15 U.S.C. § 77d. *See, e.g., G. Eugene England Foundation v. First Federal Corp.,* 663 F.2d 988, 990 (10th Cir.1973); *United States v. Abrams,* 357 F.2d 539, 547 (2d Cir.), *cert. denied,* 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966).

Finally, plaintiffs in this case argue that the unwritten Purchase Agreement, which entitled these defendants to notice of any registration, to have their shares included in a registration, and to require a public offering by October 1, 1984, demonstrates that they acquired their shares "with a view towards distribution." Plaintiffs additionally note that defendants made huge profits on the sale of their shares to the underwriters and had inside information regarding the financial condition of the company. In contrast, defendants point out that the fact that they owned their shares for four years before selling them, and in fact sold only a small portion of them, shows that the shares were purchased for investment and not distribution. *See* Preliminary Notes to 1933 Act Rule 144, 17 C.F.R. § 230.144 (1984) (subsequent acts and circumstances should be used to analyze intent at the time of purchase).

In *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 425, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972), the Court specifically discouraged the practice of conducting "a judicial search for the will-o'-the-wisp of an investor's 'intent' " in litigation brought under federal securities laws. Plaintiff's many allegations that these defendants purchased with a view to distribution without more are not sufficient to state a claim under § 11. Accordingly, the motion to dismiss is granted.

### 2. *Liability of California Partners*

Defendant California Partners is a limited partnership which at the time of the offering owned 4.9 percent of the outstanding shares of Activision. Plaintiffs allege that California Partners is a "controlling

person" in Activision based on its stock ownership and its contract rights under the Purchase Agreement. Amended Complaint at ¶ 18.

California Partners' general partner is Draper Associates, which was named as a defendant in the prior complaint based on its status with respect to California Partners. Judge Orrick dismissed Draper Associates with leave to amend to "plead specific facts demonstrating its ability to direct and control the Company." Order at 22. The amended complaint contains no allegations against Draper Associates.

Defendants now move to dismiss California Partners from this action, arguing that since (1) limited partnerships can act only through their general partners, and (2) plaintiffs cannot allege facts to show that its general partner Draper Associates "controlled" Activision, plaintiffs cannot state a claim against California Partners. Defendants concede that as a limited partnership California Partners can be sued in its own name, *Evans v. Galardi,* 16 Cal.3d 300, 311, 128 Cal.Rptr. 25, 546 P.2d 313 (1976), but contend that since plaintiffs cannot even *plead* acts of control by the general partner they could not *prove* a control case against California Partners.

■ The court finds this argument unpersuasive. Draper Associates was dismissed as a defendant because the allegations against it were based solely upon its general partner status with respect to California Partners. Defendant California Partners cannot avoid "control" liability at this stage merely because the allegations against its general partner were insufficient to support separate liability. The allegations against California Partners as an entity suffice to withstand a motion to dismiss. Accordingly, this motion is denied.

### 3. *Liability of William Draper III*

Defendant William Draper III is the sole shareholder of Draper Associates and was a director of Activision and of defendant Sutter Hill until 1981. At the time of the offering he owned 3.9 percent of the Activision stock. Plaintiffs claim that Draper, in his individual capacity, is a "controlling person" of Activision because of his stock ownership, contractual rights under the Purchase Agreement, and his relationship with Sutter Hill, Draper Associates, and California Partners. Amended Complaint at ¶ 19.

Defendants argue that "none of these purported indicia of control support plaintiffs' claims" against Draper and hence he should be dismissed at this time. They argue, for example, that 3.9 percent stock ownership is insufficient to exert control, and that since Draper resigned from the Activision and Sutter Hill boards in 1981, two years before Activision went public, he was in no position to control the company.

■ Judge Orrick ruled that Draper's prior board membership, stock ownership, and contractual relationship with Activision were sufficient to plead control. The court sees no reason to disturb this ruling at this point. Inasmuch as plaintiffs are suing Draper in his own right, the fact that Draper Associates and California Partners have been dismissed from the case is unimportant. The motion to dismiss William Draper III is denied.

Finally, the amended complaint states at ¶ 19 that Draper is a general partner of Sutter Hill despite the fact that Judge Orrick ruled this allegation "patently false" based on evidence presented to him. This allegation is therefore stricken from the complaint.

### 4. *Section 10(b)*

Defendants California Partners and William Draper III renew motions made, and denied by Judge Orrick, to dismiss the aiding and abetting and conspiracy claims under § 10(b). The same arguments rejected by Judge Orrick are made here. They are no more persuasive the second time around. These motions are denied.

### C. *Underwriter Defendants' Motion*

### 1. *Section 12(2)*

The underwriter defendants move to dismiss the § 12 claims against them by plain-

tiffs who did not purchase Activision shares directly from them. The complaint shows that none of the plaintiffs purchased from Morgan Stanley and only two plaintiffs, Rowland and Weinberger, purchased all shares from Rothschild; plaintiff Cadelago purchased part of his shares from Rothschild. Defendants argue that (1) plaintiffs have not adequately alleged their substantial participation in the offering so as to hold them liable for violating § 12(2), and (2) the statutory scheme of the Securities Act limits the liability of underwriters to shares they actually sold.

■ The standards articulated above for "substantial participation" for purposes of § 12(2) apply equally to the underwriter defendants. Plaintiffs' amended complaint fails to plead substantial participation of the co-lead underwriters in sales transactions other than the ones they actually conducted. Coupled with the allegations already held insufficient the amended complaint alleges that the co-lead underwriters created and managed the underwriting syndicate, entered into a purchase agreement with the other defendants, varied the offering price to the securities, sold securities to retail customers on behalf of other class members, and determined the form and manner of the public advertising and agreements with dealers. Amended Complaint ¶ 61(f).

As was true of the allegations directed against the Activision defendants, these claims do little more than seek to impose liability on the co-lead underwriters for their institutional involvement in the public offering of Activision securities. As such, the allegations are insufficient to support the § 12(2) claims against them for shares they did not directly sell to plaintiffs. *See, e.g., Lawlor*, 569 F.2d at 1288 ("[l]iability [under § 12] may be imposed on any person who actively solicits an order, participates in negotiations, or arranges the sale.").

■ In addition, the structure of the Securities Act of 1933 indicates that the liability of underwriters in securities fraud cases should not be expanded liberally. Whereas § 12 of the Act provides purchas-

ers of securities a rescissionary remedy against "sellers," § 11 of the Act provides purchasers a damage remedy against groups of individuals, including underwriters, who participate in an offering utilizing a false or misleading registration statement. Section 11 contains a specific provision limiting damage claims against an underwriter to damages amounting to "the total price [of] the securities underwritten *by him.*" 15 U.S.C. § 77k(e) (emphasis added). To construe § 12 so broadly as to hold defendant underwriters liable for shares they did not sell would vitiate the express limitation set forth in § 11. This is not to say that under *no* circumstances could underwriters be found liable under § ˙12. However, plaintiffs would have to allege more than the provision of underwriter services to overcome the statutory limitation.

Therefore, the § 12(2) claim against Morgan Stanley is dismissed since none of the named plaintiffs purchased securities from that firm and plaintiffs failed to allege that Morgan Stanley was a "substantial factor" in the sale. Similarly, defendant Rothschild is liable to the named plaintiffs only to the extent that the plaintiffs purchased their securities from Rothschild. However, as discussed in Part II of this order, the court will certify a plaintiff class and a defendant underwriter class to litigate the § 12(2) claim. The defendant class, represented by Rothschild, will be certified for the single issue of determining whether the alleged omissions and misrepresentations in the offering materials were misleading.

### 2. *California Corporations Code*

Plaintiffs assert claims against the underwriter defendants pursuant to California Corporations Code §§ 25400 and 25500 (Count IV) and §§ 25401, 25501, 25504, and 25504.1 (Count V).

■ Section 25400 forbids the use of a false or misleading statement "for the purpose of inducing the purchase or sale" of a security if the defendant knew or had reason to know that the statement was false

or misleading. Section 25500 sets forth liability for willful violations of § 25400. As discussed above, liability under these sections is limited to those "sellers" found liable under § 12(2). Thus, this claim is dismissed as to defendant Morgan Stanley. The claims remain against Rothschild to the extent that plaintiffs purchased their securities from that firm.

■ Section 25401 prohibits the offer or sale of a security by means of any oral or written communication which contains a materially false or misleading statement. Section 25501 creates the cause of action for a violation of § 25401. These sections together are similar to § 12(2) and require that plaintiffs allege seller or "substantial factor" status. *Hudson v. Capital Management International, Inc.*, No. 81–1737, slip op. at 3 n. 1 (N.D.Cal. March 7, 1984). Therefore, the claims are dismissed as to Morgan Stanley in their entirety and to Rothschild to the extent that plaintiffs did not purchase securities from them.

■ The remaining claims under Count V are dismissed with prejudice. Section 25504 imposes liability on those who "control" persons in violation of § 25501 and § 25504. It imposes liability on those who "materially assist" violations of § 25401 "with intent to deceive or defraud." Only defendant Rothschild remains liable under §§ 25401 and 25501 of the statute. These claims fail since the complaint does not allege either control by or material assistance of Rothschild by Morgan Stanley.

Finally, the jurisdictional impediments raised by defendants to the pendent state claims are not well taken. As discussed below in reference to the plaintiff class certification motion, the Activision securities were purchased by reason of activity in California since the offers emanated from this state and the acceptances were directed towards it.

## II. CLASS CERTIFICATION MOTIONS

Plaintiffs have moved pursuant to Fed.R. Civ.P. 23(b)(3) for certification of a plaintiff class for all claims in this action and a defendant underwriter class for the § 11 claim. They also have moved pursuant to Rule 23(b)(3) or 23(b)(1)(A) for certification of an underwriter class for the single issue under § 12(2) of whether the Registration Statement and Prospectus contained materially misleading statements or omissions.[7]

### A. *Plaintiff Class Certification*

■ Plaintiffs move to certify a class of plaintiffs defined as "persons and entities, other than defendants, who purchased common shares of Activision from June 9, 1983 through September 16, 1983." Defendants do not raise a general challenge to the propriety of plaintiff class certification in this case. Indeed, they do not oppose certification of a plaintiff class for the § 10, Rule 10b–5, or § 11 claims, nor do they oppose plaintiff Rowland as a class representative. Rather, they limit their objections to specific claims (the state claims and § 12(2)), the adequacy of particular named plaintiffs to represent the class, and the definition of the class.

### 1. *Rule 23*

Under Fed.R.Civ.P. 23, a party seeking class certification must satisfy the prerequisites of 23(a) and one of the subdivisions of 23(b). Under subsection (a) of Rule 23 plaintiffs must demonstrate that

(1) the class be so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Subdivision (b)(3) further requires that the court find that common questions of law or fact predominate over individual questions, and that a class action is superior to other methods "for the

---

7. The original motion sought certification of the § 12(2) class only under Rule 23(b)(1). Plaintiffs raised the possibility of certification under 23(b)(3) in their reply.

fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

Although defendants do not challenge all aspects of these requirements, each is addressed below since the court is required to make specific findings. *In Re Victor Technologies Securities Litigation,* 102 F.R.D. 53, 56 (N.D.Cal.1984).

The Ninth Circuit takes a liberal view of class actions in securities litigation. *Blackie v. Barrack,* 524 F.2d 891, 903 (9th Cir. 1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) ("the ultimate effectiveness of [the security anti-fraud laws] may depend on the applicability of the class action device.' ") (quoting Loss, Securities Regulation 1819 (2d ed. 1961) ). Certification of a plaintiff class is the rule in this district in cases such as the instant one where the securities fraud alleged concerns misrepresentations or omissions in offering materials issued prior to a public offering. *See, e.g., Victor Technologies Securities Litigation,* 102 F.R.D. at 57; *In Re Itel Securities Litigation,* 89 F.R.D. 104 (N.D. Cal.1981).

### 2. *The Requirement of Rule 23(a)*

#### a. *Numerosity*

The numerosity requirement is met. This action involves the sale of four million shares of Activision stock in the public offering as well as additional shares traded over-the-counter during the class period. Defendants do not dispute that the class of purchasers as defined by plaintiffs is so numerous that joinder is impracticable.

#### b. *Commonality*

The second prong of Rule 23(a) requires that class members share common questions of law or fact. The gravamen of the instant action is alleged misrepresentations or omissions in the Registration Statement and Prospectus. Since the offering materials were uniform as to all purchasers of Activision, the materiality and existence of the alleged omissions and misrepresentations are by definition questions of law and fact common to all class members. In

*Blackie v. Barrack* the Ninth Circuit adopted a "common sense approach" and found that "a class of purchasers allegedly defrauded over a period of time by similar misrepresentations ... is united by a common interest in determining whether a defendants' course of conduct is in its broad outlines actionable." 524 F.2d at 902. This commonality "is not defeated by slight differences in class members' positions." *Id.* Thus, the commonality requirement is satisfied. *Accord Victor Technologies,* 102 F.R.D. at 56; *Weinberger v. Jackson,* [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,619 at 99,150 (N.D.Cal.1984).

#### c. *Typicality*

This prong requires that the claims and defenses of the class representative do not differ significantly from the claims or defenses of the class as a whole. Plaintiffs argue that inasmuch as the claims arose from a common course of conduct on the part of defendants, the only material variation among class members is the amount of damages to which each member is entitled. Such differences are insufficient to defeat class certification. *Blackie,* 524 F.2d at 905.

Defendants' objections to the duration of the class period and the propriety of class certification for certain claims raise "typicality" problems. These issues will be dealt with below. Suffice it to say at this juncture that these objections are not well taken. The typicality requirement should be construed broadly. *Weinberger,* ¶ 91,619 at 99,150. "Differences in the amount of damage, the size or manner of [stock] purchase, the nature of the purchaser, and even the specific document influencing the purchase will not render a claim atypical in most securities cases." 5 Newberg on Class Actions, § 8816 at 850 (1977).

#### d. *Adequacy*

The requirement that plaintiffs must fairly and adequately represent the class has two components: (1) that plaintiffs are represented by competent counsel,

and (2) that the representatives do not have interests antagonistic to the members of the class. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3rd Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

Defendants do not dispute the competence of counsel, and the court notes that these counsel have ample experience in bringing securities fraud class action suits. Defendants do, however, challenge the adequacy of three of the four proposed class representatives on numerous grounds.

They argue, *inter alia*, that (1) plaintiff Cadelago was "obstructive and flippant" during deposition, and that various criminal charges against him make him an inadequate class representative; (2) plaintiff Blumenfeld failed to fulfill his discovery obligations; and (3) plaintiff Weinberger is unable to adequately represent the class because he is a class or derivative plaintiff in numerous other lawsuits and is subject to unique defenses.

None of these challenges is well taken. The court has examined the depositions and other discovery items of which defendants complain and concludes that none of the problems are so significant as to preclude any of the named plaintiffs from acting as a class representative. The cases cited by defendants regarding failure to cooperate with discovery raise more substantial problems than those presented here. For example, in *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502 (S.D.N.Y.1976), the named plaintiff was not only uncooperative but also untruthful in his deposition testimony. In addition, there was a "maintenance" problem in that case. In *Kline v. Wolf*, 88 F.R.D. 696 (S.D.N.Y.1981), *aff'd* 702 F.2d 400 (2d Cir.1983), one named plaintiff refused to answer permissible and relevant discovery questions and another plaintiff presented testimony contradicted by his broker.

Further, Cadelago's criminal record, which consists of a guilty plea to a battery charge, is irrelevant to the issue of adequate class representation since it does not implicate Cadelago's ability to act as a fiduciary or demonstrate any antagonism with class members. As the court stated in *Weinberger*, "[p]ersonal qualifications or motives of the proposed class representative are not determinative of the adequacy of the representative." ¶ 91,619 at 99,150.

Finally, the charges that Weinberger is too involved with other cases to be an adequate representative is unfounded. Indeed, the specific arguments raised by defendants regarding this plaintiff were presented to and rejected by the courts in *Diasonics*, 599 F.Supp. at 452–53, *see* Plaintiffs' Exhibit G to the Allured Declaration, and similar ones were rejected by the court in *Weinberger*, ¶ 91,619 at 99,151. This court concurs with *Weinberger* that (1) the record does not indicate that Weinberger could not devote adequate time to the case, and (2) as a practical matter once the action commenced it is counsel, not plaintiff, who directs the litigation. *Id.*

Defendants' argument that Weinberger is subject to unique defenses is based on his deposition testimony that he did not rely on the offering materials in purchasing his Activision stock. Rather, he read about the stock in the publication *New Issues*. Again, this argument was raised and rejected in *Weinberger* and *Diasonics*. The *Diasonics* court ruled that since the Ninth Circuit does not require reliance for a claim under §§ 10(b), 11, or 12(2), lack of reliance does not render a proposed representative atypical. 599 F.Supp. at 452. Further, as noted above, the typicality requirement is not affected by the particular document used to influence the purchase. *Weinberger*, ¶ 91,619 at 99,150.

### 3. The Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that the court find that common issues of law or fact predominate over individual issues, and that class action is a superior form of adjudicating the dispute. "The mere presence of potential individual issues does not defeat the predominance of common questions." *McFarland v. Memorex*, 96 F.R.D. 357, 363 (N.D.Cal.1982).

These requirements are met. Since the complaint alleges a "common course of conduct" of misrepresentations and omissions that affected all class members in the same manner, common questions predominate. *Blackie,* 524 F.2d at 905–908. Courts in this district addressing claims with underpinnings similar to the instant case are in accord. *See, e.g., Victor Technologies,* 102 F.R.D. at 57 ("it is difficult to discern any question of law or fact that will differ among members of the putative plaintiff class.") In addition, given the large number of potential plaintiffs in this action, a class action is the most efficient and economical means of proceeding.

Defendants seriously dispute class certification only as to certain claims. These claims are addressed below.

### a. *State Law Claims*

### i. *Common Law Claims*

Defendants raise two arguments against certification of state common law claims. First, they argue that the common law claims fail under 23(b)(3) because individual choice of law questions predominate over common questions. They note that the case involves more than 3,000 transactions in some 45 states across the country.

In *Harmsen v. Smith,* 693 F.2d 932, 946–7 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), the Ninth Circuit noted that a district court addressing a conflict of law question for pendent securities fraud claims would be required to follow California choice of law rules. The burden is thus on defendants to show "1) a true conflict exists, 2) each state has an interest in applying its own law, and 3) if each state has such an interest, which state's interest would be more impaired should its law not be applied." *Weinberger,* ¶ 91,619 at 99,152.

The *Weinberger* and *Victor Technologies* courts both addressed the "conflict of law" argument raised herein, and both rejected it as premature in that defendants had not satisfied the *Harmsen* test. *See Weinberger,* ¶ 91,619 at 99,152; *Victor Technologies,* 102 F.R.D. at 60. This case differs from *Weinberger* and *Victor Technologies,* however, since defendants in this case attempt to satisfy the requirements by canvassing the provisions of various state security laws. Defendants note, for example, variations in state law on the following issues: elements of common law fraud, standards of proof, need to prove individual reliance, defenses to negligent misrepresentation, and standards for punitive damages. Defendants argue that these differences render class certification of the pendent state claims unmanageable and improper.

Despite defendants' showing that material differences may indeed exist between California law and the law of other states, defendants have failed to indicate why California law would not apply in this case. Defendants must do more than show a variance in the law. They must show that the interest of other states in having their laws followed in this case is greater than California's interest in applying its own laws. This is a substantial burden for defendants to overcome given that Activision's principal place of business is in California, the issuance emanated from California, and the purchaser's acceptances were directed at California.[8] If defendants could show that California's consumer protection laws, for example, were less strict than those of another state with an interest in this action they would have a colorable argument that the interests of another state were stronger than those of California. Absent such a showing, however,

---

**8.** Defendants cite *Hudson v. Capital Management International, Inc.,* 565 F.Supp. 615 (N.D. Cal.1983) for the holding that class certification is inappropriate for securities fraud claims when no single state law governs. However, *Hudson* is easily distinguished from the instant case. In *Hudson,* the securities at issue were sold pursuant to numerous limited partnerships

rather than pursuant to a uniform Registration Statement and Prospectus. Sales were directed at particular states and in some cases were effected only intrastate. The offering materials contained different representations. Thus, the laws of a single state could not apply in that case.

their choice of law argument does not preclude class certification at this time. The court will entertain a presumption that California law will control this case. *Accord Victor Technologies,* 102 F.R.D. at 59 (rejecting the choice of law argument in part because the court "will most likely apply California law to all pendent state law claims").

Defendants' second argument is that even if the court were to apply California law, individual questions of reliance would predominate over common questions. This argument is faulty in two respects. First, the proof needed to show reliance under the state common law claims is similar to that needed under the federal claims, and defendants in this case have not opposed certification of a plaintiff class for the Rule 10b–5 claims. As the court stated in *Dekro v. Stern Brothers & Co.,* 540 F.Supp. 406, 418 (W.D.Mo.1982), since "the similarities between a Rule 10b–5 action and common law fraud outnumber the differences ... [c]lass treatment of both claims will permit efficient presentation of proof on such overlapping issues as defendants' scienter." *Accord Cameron v. E.M. Adams & Co.,* 547 F.2d 473, 479 (9th Cir.1976) (pendent statutory claims).

Moreover, in *Vasquez v. Superior Court,* 4 Cal.3d 800, 814, 94 Cal.Rptr. 796, 484 P.2d 964 (1971), the California Supreme Court ruled that "if the trial court finds that material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." Defendants read the word "were made" in the *Vasquez* holding as stating that reliance can be inferred only if it can be shown that "misleading representations were actually *communicated* to each individual in the class." Activision Defendants' Opposition to Plaintiff Class Certification at 24–25. The court finds nothing in *Vasquez* to support this contention. Indeed, had the California Supreme Court intended to limit its ruling as defendants suggest it would not have supported its ruling by citation to similar rulings by federal courts addressing "class action cases in which stockholders have alleged

fraud on the basis of printed misrepresentations in a corporation's prospectus." *Id.* at 815, 94 Cal.Rptr. 796, 484 P.2d 964. *See also Johannessen v. Wilson,* No. C–81–4138, slip op. at 10 (N.D.Cal.1983) (interpreting California law as stating that "an inference of reliance arises if a material false representation was made to persons whose acts thereafter were consistent upon the representation, and justifiable reliance may be established on a common basis.").

Defendants' reliance arguments do not prevent class certification at this time. Should reliance questions come to dominate the action the court may redefine the class or bifurcate those issues for trial.

ii. *Statutory Claims*

Defendants argue that certification of a nationwide class for the state statutory claims violates the jurisdictional requirements of Cal.Corp.Code § 25008(b). They argue that at most the court should "certify a statewide class consisting of members of the nationwide class and represented by plaintiffs with the requisite nexus to California." Defendants are correct that Cal. Corp.Code § 25008(b) restricts the class membership for the state statutory claims, albeit not to the extent they contend.

Plaintiffs' claims brought pursuant to the California Corporations Code must satisfy the following jurisdictional requirement:

An offer to sell or buy is made in this state when the offer either originates from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to buy or to sell is accepted in this state when acceptance is communicated to the offeror in this state ...

Cal.Corp.Code § 25008(b). The initial offering in this case emanated from Activision's headquarters in California, and acceptances were directed to California as well. Therefore, purchasers of the initial offering—including class representatives in this case—satisfy the jurisdictional requirements of the statute so that class certifica-

tion is appropriate. However, members of the plaintiff class who purchased Activision stock over-the-counter after the public offering should not be included in the class for claims filed under the California Corporations Code unless they purchased the stock in California. *Victor Technologies,* 102 F.R.D. at 60; *Weinberger v. Jackson,* ¶ 91,619 at 99,152.

### b. *Section 12(2) Claims*

The underwriter defendants argue that the named plaintiffs can represent a class for purposes of the § 12(2) claims only if they themselves can assert such a claim against the named defendants. Defendants correctly cite *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973) for the proposition that a class representative cannot litigate a claim against a defendant he or she cannot sue individually. However, *La Mar* sets forth various exceptions to this rule, including one—the "juridical" link—relevant to this case. 489 F.2d at 466 ("this position ... [is not] intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious.").

▪ Defendants in this action have entered into an Agreement Among Underwriters. The court finds this Agreement sufficient to provide the "juridical" link to take this case out of the *La Mar* situation. By the terms of this Agreement defendant underwriters are bound together in a common course of conduct for purposes of the Activision offering. Thus, "a single resolution of the dispute would be expeditious." *Accord In Re Itel Securities Litigation,* 89 F.R.D. 104, 123 (N.D.Cal.1981). *See also Hudson,* CCH Fed.Sec.L.Rep. ¶ 99,222 at 95,903 (distinguishing that case from *Itel* because no agreement among defendants was alleged, thereby limiting the scope of the plaintiff class action).

In holding that the Agreement Among Underwriters serves as a juridical link among defendants the court does not imply that such an agreement dispenses with the privity requirements of the Securities Act.

A plaintiff class member in this case may only recover from an underwriter from whom he or she purchased securities, and only purchasers who bought from a party to the Agreement are included in the class. With those restrictions and because a defendant class of underwriters under § 12(2) is certified herein, the court finds that the named plaintiffs, although not in privity with the named defendants, are adequate representatives of other members of the class who are in privity with parties to the underwriting agreement.

### 4. *Class Definition*

Defendants raise two objections to the definition of the class proposed by plaintiffs. First, they argue that the class should be limited to purchasers of Activision securities within the United States since foreign courts would be unlikely to accord preclusive effect against their citizens should defendants prevail in this action. Such a result, they argue would be unfair to defendants, particularly since plaintiffs would have the benefits of a judgment in their favor.

It would be premature for the court to limit the class at this time based on such sheer speculation. Defendants cite *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 996–7 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), to support their position but in *Drexel* the court had the benefit of evidence in the record from foreign courts that they would not give preclusive effect to the judgment in that case. Indeed, the *Drexel* court specifically differentiated that case from one where a court was confronted with a mere possibility that a foreign court would not recognize and enforce a judgment. 519 F.2d at 996. In the absence of further information, defendants' argument will not prevent certification of a class including the foreign purchasers. The court retains the power to redefine the class at a later juncture should the need arise. Fed.R. Civ.P. 23(c).

Defendants' second objection to the class definition is that the class period should not

extend beyond June 10, 1983, the day following the public offering. They argue that the volatile behavior of Activision stock during the class period shows that the drop in Activision stock was related to changes in the market and not to the defendants' alleged fraudulent behavior. They also argue that such a broad class period ignores the curative effect of Activision's own disclosures during that period. Finally, they argue that class representatives who purchased their securities through the initial offering are inadequate representatives of later purchasers.

■■■ The first two arguments implicate the merits of plaintiffs' case and are therefore inappropriate to address on a motion for class certification. *Blackie*, 524 F.2d at 901 (a class certification motion "does not permit or require a preliminary inquiry into the merits."). The final argument also fails. "[I]t is no barrier that [a] plaintiff may have purchased ... stock pursuant to the initial offering yet he seeks to represent purchasers in the aftermarket." *Weinberger*, ¶ 91,619 at 99,150. Thus, the class should be certified as defined.

### B. *Defendant Class Certification*

#### 1. *The § 11 Claim*

■■■ Plaintiffs move pursuant to Rule 23(b)(3) to certify a class of defendant underwriters who participated in the public offering of Activision for the purpose of litigating their § 11 claim. They name Morgan Stanley and Rothschild as class representatives since these are the co-lead underwriters under the Agreement Among Underwriters.

Defendants spend much of their energy arguing against the propriety of defendant class actions in general. Such arguments are not well taken. Following the lead of Judge Williams in *In Re Gap Stores Securities Litigation*, 79 F.R.D. 283 (N.D.Cal. 1978), numerous court in this district have certified defendant classes in securities fraud cases similar to the instant one. *See, e.g., Victor Technologies*, 102 F.R.D. at 61;

*McFarland*, 96 F.R.D. 357; *Itel*, 89 F.R.D. 104.

#### a. *Rule 23(a)*

#### i. *Numerosity*

■■■ The prospective class of underwriters includes 150 geographically diverse firms. Defendants argue that since the group of underwriters contains a finite number of firms all known to plaintiff the numerosity requirement is not satisfied. The court is not persuaded. Joinder of all class members need not be impossible to satisfy this requirement, merely impracticable. *Itel*, 89 F.R.D. at 112. "When the number of parties to be joined reaches the point of eliminating individual influence over pleading, discovery, and litigation strategy, then joinder cannot be considered a reasonable alternative to class adjudication." *Gap Stores*, 79 F.R.D. at 302. The class of 150 underwriters is larger than the certified in *Gap Stores* (91), *Itel* (113), *McFarland* (104), *Weinberger* (89) and *Victor Technologies* (93). This prong of Rule 23(a) is satisfied.

#### ii. *Commonality*

The underwriters' liability under § 11 is predicated on a finding that the offering materials contained material representations or omissions. Since the same materials were disseminated by each defendant in this case, the commonality requirement is satisfied. In addition, defendants possess common affirmative defenses. *Itel*, 89 F.R.D. at 112; *Victor Technologies*, 102 F.R.D. at 62.

#### iii. *Typicality*

The underwriter defendants will share the following three defenses to the § 11 claim: (1) due diligence on the part of the lead underwriters, (2) no misrepresentations or omissions in the offering materials, and (3) that plaintiffs purchased their Activision securities with knowledge of the misrepresentations or omissions. *Itel*, 89 F.R.D. at 112.

An understanding of underwriting syndication is preliminary to this discussion under §§ 11 and 12(2). The underwriters, or members of the syndicate, enter into an agreement commonly referred to as an agreement among underwriters. The managing or lead underwriters are given authority to act on behalf of all syndicate members with respect to underwriting the issue and getting it to market. They are responsible for negotiating and contracting with the issuer, preparing the registration statement and participating in the "due diligence" meeting. The warranties and representations of the company contained in the agreement between the underwriters and the issuer run to all members of the syndicate; the obligations of the syndicate to the company are shared by all its members. *See* G. Robinson & K. Eppler, *Going Public*, §§ 32–41, 48 (1978 rev.). The members are not relieved of their own due diligence and reasonable investigation responsibilities. However, they have thrown in their lot together to spread the risk. The actions taken by the managing underwriters will work to their benefit or detriment. *See Escott v. Barchris Construction Corp.*, 283 F.Supp. 643, 697 (S.D.N.Y. 1968). The commonality of interest far outweighs individual issues.

Nonetheless, defendants argue that the typicality requirement is unsatisfied. First, they argue that the due diligence defense of the lead underwriters is different from the due diligence defense of the class members. This contention, while true, does not defeat class certification inasmuch as the other defenses are identical. Clearly, the lead underwriters have an incentive to prove their own due diligence, and a finding of due diligence on their part could exonerate the class members as well. *Gap Stores*, 79 F.R.D. at 302.[9] Only if the lead underwriters are found to have acted without due diligence would the diligence of the class members become a factor. The court could bifurcate the trial at that point should the need arise.

Defendants' second argument is that the individual underwriters would be differentially liable for damages. As discussed in the context of the plaintiff class certification motion, individual questions of damages are insufficient to defeat a class certification motion. *Blackie*, 524 F.2d at 905.

### iv. *Adequacy*

As discussed above, the standards for adequacy of representation are that the class representatives must be represented by competent counsel and that there must be no antagonism between the interests of the class representatives and class members. *Bogosian*, 561 F.2d at 449. Not surprisingly, defendants do not argue that their counsel are incompetent. Rather, they point to several conflicts between the interests of the lead underwriters and the class members.

Defendants argue that the existence of numerous nonclass claims and the large financial stake that individual class members have in the litigation means that the individual class members "should be allowed to protect their own interests." Underwriters' Opposition to Defendant Class Certification at 14. There are two answers to this objection. First, class certification pursuant to Rule 23(b)(3) contains an "opt out" provision which could be exercised by any individual class member who feels its interests are not adequately protected by the class representatives. Second, should the existence of nonclass claims lead the class representatives to enter into a settlement agreement unfavorable to the class members (or refuse to enter into an advantageous agreement) the court retains the power to decertify the class at that point. "Precisely to protect against unfair compromises, Rule 23(e) requires a hearing and court approval of any settlement of class claims." *Gap Stores*, 79 F.R.D. at 304.

Defendants cite *Benzoni v. Greve*, 54 F.R.D. 450, 454–5 (S.D.N.Y.1972) to sup-

---

**9.** For this same reason the differences between the due diligence defenses of the lead underwriters and the individual underwriters do not render the lead underwriters inadequate class representatives. *Gap Stores*, 79 F.R.D. at 304.

port their contention that defendant class certification is inappropriate when all members of the underwriting syndicate are subject to substantial liability. However, *Benzoni* differs from the instant case in that the designated representative in *Benzoni* was not a "lead" underwriter pursuant to an Agreement Among Underwriters. Indeed, there was no such Agreement in that case. The existence of an Agreement Among Underwriters in the instant case is significant in determining that the co-lead underwriters are adequate representatives of the class, for in designating themselves co-lead underwriters Morgan Stanley and Rothschild in essence agreed to act as fiduciaries for the individual underwriters for the purposes of the Activision offering.[10] *Accord McFarland,* 96 F.R.D. at 365 (finding that the Agreement Among Underwriters provided a basis for determining that the co-lead underwriters would adequately represent the interests of the class member.).

Defendants also contend that they are inadequate to represent the foreign members of the underwriting syndicate for they have no incentive to argue the important defense of personal jurisdiction. They suggest that these underwriters *may* have distributed their shares solely in foreign countries. They also claim that extraterritorial service of process is complicated by the fact that the foreign entities may not understand the documents they receive. Thus, they argue, the foreign underwriters should be excluded from any underwriter class.

This argument is entirely prospective and should not defeat class certifications at this time. "[M]ere speculation about the possibility of conflict will not defeat certification of a class action." *Marshall v. Electric Hose and Rubber Co.,* 68 F.R.D. 287, 292 (D.Del.1975). The court retains the power to redefine the class as necessary.

### b. *Rule 23(b)*

The certification of a defendant underwriter class to litigate § 11 claims is widely accepted in this district. *See, e.g., Victor Technologies,* 102 F.R.D. at 62–63; *Weinberger,* ¶ 91,619 at 99,153; *Itel,* 89 F.R.D. at 114; *McFarland,* 96 F.R.D. at 366. Defendants claim that the existence of such individual issues as the due diligence of the class members and the proper calculation of damages precludes certification. As discussed above, the due diligence of the members of the syndicate is an individual issue but does not outweigh the common issues of the existence and materiality of alleged omissions and misstatements in the offering materials, the due diligence of the lead underwriters, and whether plaintiffs purchased their securities with knowledge of the true state of affairs. *Itel,* 89 F.R.D. at 114. Further, the calculation of damages, while an individual issue, does not preclude class certification. *Blackie,* 524 F.2d at 905. The common issues clearly predominate over the individual ones in this case.

Defendants also argue that certifying a class to litigate the § 11 claims presents problems of manageability. They cite *Katten Realty Trust v. AT & T,* No. 82–Civ–8586, slip op. at 10 (S.D.N.Y. August 15, 1983) to support this proposition. However, *Katten* must be interpreted in light of the fact that the court in that case refused to certify a plaintiff class. Thus, defendant class certification was unnecessary since plaintiffs, "[i]f successful, ... would be able to recover whatever damages they may have suffered from the existing named defendants." *Id.*

The court finds that certification of a defendant class of underwriters to litigate the § 11 claim is appropriate. The superiority in terms of judicial economy of adjudicating these claims in one class action rather than 150 separate actions is manifest. Such is the case even if the necessity later

---

**10.** The Agreement Among Underwriters also undercuts the contention raised at oral argument that certification of a defendant class for litigating the § 11 claim renders Morgan Stanley and Rothschild "forced fiduciaries."

arises to try individual issues separately. *Gap Stores,* 79 F.R.D. at 305.

### i. *The § 12(2) Claim*

Plaintiffs seek certification of a defendant underwriter class for the single question of whether the Registration Statement and Prospectus contained material misstatements or omissions. This question is the same as the prima facie requirement of § 11. *Itel,* 89 F.R.D. at 115. Defendant Rothschild is the sole defendant class representative for this claim since the court dismissed the § 12(2) claim against Morgan Stanley.

### A. *Rule 23(a)*

The requirements of Rule 23(a) are met for the reasons set forth in detail above. The proposed class of 150 underwriters satisfies the numerosity requirement; the commonality requirement is met by definition since plaintiffs move for certification of a single issue; the defenses to this issue are identical; and defendant Rothschild is an adequate representative since it is represented by competent counsel and has no antagonism with other members of the class.

### B. *Rule 23(b)*

Plaintiffs originally sought certification pursuant to Rule 23(b)(1)(A), but in their Reply Memo argued that certification would be appropriate under Rule 23(b)(1)(A) or 23(b)(3). The courts in this district that have certified a defendant class for the single issue described herein have split as to which of the subsections of Rule 23(b) applies. *Compare Itel,* 89 F.R.D. at 124, *and McFarland,* 96 F.R.D. at 366 (applying 23(b)(1)) *with Victor Technologies,* 102 F.R.D. at 64–65 (*sua sponte* applying Rule 23(b)(3)) *and Weinberger,* ¶ 91,619 at 99,154 (applying Rule 23(b)(1) but finding 23(b)(3) appropriate as well).

Rule 23(b)(1)(A) allows for class certification if "the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." This subsection is different from (b)(3) in that a class member may not opt out and the notice provisions are less detailed. The court in *Itel* allowed certification under this rule because without class certification of this issue individual plaintiffs would be forced to litigate the truthfulness of the offering materials, even when the identical question is part of the § 11 class claim. This could lead to inconsistent results since the same document could be found misleading under § 11 but truthful under § 12. *Itel,* 89 F.R.D. at 124.

In *McDonnell Douglas Corp. v. U.S. District Court,* 523 F.2d 1083, 1086 (9th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), the Ninth Circuit held that Rule 23(b)(1)(A) did not apply in cases where a party simply could be held liable in some actions but not in others. The court wrote,

> Admittedly, separate actions could reach inconsistent results and inconsistent resolutions of the same question of law might establish 'incompatible standards of conduct' in the sense of different legal rules governing the same conduct. But subdivision (b)(1)(A) was not intended to permit class actions simply when separate actions would raise the same question of law. To hold otherwise would be to render superfluous the detailed provisions of subdivision (b)(3).... [T]he 'incompatible standards of conduct' of subdivision (b)(1)(A) must be interpreted to be incompatible standards of conduct required of the defendant in fulfilling judgments in separate actions.

The *Itel* court distinguished that case from *McDonnell Douglas* because in *Itel* the same plaintiffs would be suffering inconsistent adjudications on the same issue against the same defendant whereas in *McDonnell Douglas* different plaintiffs would be suffering inconsistent adjudications. *Itel,* 89 F.R.D. at 125. *Itel* went on to certify the proposed class under 23(b)(1)(A), noting the judicial efficiency of having one determination of the existence and materiality of alleged misrepresenta-

tions and omissions in the offering materials binding against all underwriters for both §§ 11 and 12(2) claims. *Id.* at 126.

■■■ This court reads *McDonnell Douglas* as precluding Rule 23(b)(1)(A) class certifications in situations such as the instant one where inconsistent findings would lead simply to different legal standards applying to the same conduct. *Itel* appeared to certify the defendant class pursuant to 23(b)(1)(A) because it assumed that 23(b)(3) certification was unavailable under *La Mar* since plaintiffs and defendants were not in privity. *See Itel,* 89 F.R.D. at 123; *accord Victor Technologies,* 102 F.R.D. at 64. Even were *La Mar* applicable to the § 12(2) claims in this case, the court agrees with *Victor Technologies* that Rule 23(b)(3) is available when plaintiffs seek to certify a defendant class for the single issue of material misrepresentations or omissions under § 12(2) because the privity issue is not reached. *Victor Technologies,* 102 F.R.D. at 64–65.

Certification pursuant to Rule 23(b)(3) requires that the court find that common issues of law and fact predominate over individual issues, and that class adjudications of the claim is superior to individual adjudication. Clearly, by limiting the class to be certified under § 12(2) to a single issue plaintiffs have ensured that common issues abound. However, defendants hotly contest the propriety of 23(b)(3) certification in this situation for two reasons. First, they claim that individual issues do, in fact, predominate over common issues. Second, they argue that single issue certification is never appropriate under Rule 23.

Defendants argue that the individual issues of the due diligence of class members overwhelm common issues of law and fact. However, an examination of the Agreement Among Underwriters and the Underwriting Agreement reveals that the individual due diligence defenses should not be as prevalent or as diverse as defendants contend. For example, signatories to the Agreement Among Underwriters have agreed to share expenses with the Manager for defending claims regarding the Regis-

tration Statement and Prospectus, and they remain bound to these terms regardless of any investigation made by or on behalf of a particular underwriter. ¶¶ 8.3, 8.5. Further, although the signatories are charged with the responsibility of examining the Registration Statement and Prospectus, the Manager is authorized to approve on behalf of the signatories any amendments or supplements to the materials. ¶ 9.1. It thus appears that the purpose of the Agreement was to join the underwriters in offering shares of Activision to the public and to have the lead underwriters take responsibility for the offering materials on behalf of the syndicate members. To suggest at this juncture that the possibility of individual due diligence defenses precludes class adjudication of issues arising from statements or omissions in the offering materials runs contrary to the purpose of the Agreement.

In addition, the Underwriting Agreement, a document signed by the president of Activision on behalf of the Company and its selling shareholders ("sellers") and Morgan Stanley on behalf of Rothschild and the syndicate members, contains representations regarding the offering materials made by the sellers to the underwriters. These representations, including professional opinions, are common to all members of the syndicate. A due diligence defense made by any syndicate member based on representations by the sellers therefore would be common to all syndicate members.

Defendants have not come forward with any evidence to show that despite the common defenses among the underwriters demonstrated by the documents before the court there would be substantial differences in any due diligence defenses raised by individual syndicate members. On the contrary, the documents indicate that the syndicate members threw their lots in together with respect to the Activision offering. Thus, it does not offend the notion of a class action to treat the syndicate members as a class for the purposes of this litigation. Whether the due diligence de-

fense of the lead underwriter ultimately succeeds or fails, the court finds no impediment to class certification at this stage of the proceeding. The court retains the power to bifurcate issues or create subclasses for trial should particular class members indeed assert their own due diligence defenses.

Defendants' second argument is that it is inappropriate to sever a single issue of a claim for class certification under Rule 23. This argument ignores the express language of Fed.R.Civ.P. 23(c)(4), which reads, "[w]hen appropriate an action may be brought or maintained as a class action with respect to particular issues." This provision "imposes a duty on the court and gives it ample power to 'treat common things in common and to distinguish the distinguishable'" 7A Wright & Miller, *Federal Practice and Procedure: Civil § 1790* ("Wright & Miller"). The Ninth Circuit has recognized that under Rule 23(c)(4) "it is within the discretion of the trial judge ... to limit the issues in a class action to 'those parts of a lawsuit which lend themselves to convenient use of the class action motif.'" *Society for Individual Rights, Inc. v. Hampton,* 528 F.2d 905, 906 (9th Cir.1975) (applying Rule 23(c)(4) to class certification pursuant to 23(b)(2) ).

Commentators on the Federal Rules note that the management devices contained in Rules 23(c) and (d) are particularly important in the context of class actions brought under 23(b)(3) because of the emphasis placed by Rule 23(b)(3) on judicial economy and procedural superiority. 7 Wright & Miller § 1777. Thus, Wright & Miller state,

> Subdivision (c)(4) is particularly helpful in enabling courts to restructure complex cases to meet the other requirements for maintaining a class action. For example, a Rule 23(b)(3) class action must be superior to other available methods for the adjudication of the controversy, and one of the tests of superiority is the manageability of the action. Since subdivision (c)(4) is designed to give the court maximum flexibility in handling class actions,

> its proper utilization will allow a Rule 23 action to be adjudicated that otherwise might have had to be dismissed or reduced to a nonrepresentative proceeding because it appears to be unmanageable.

7A Wright & Miller § 1790 (footnotes omitted).

■ Inasmuch as plaintiff and defendants already are joined in this forum to litigate the issues of the existence and materiality of alleged misrepresentations or omissions in the Activision Registration Statement and Prospectus under § 11, the savings in terms of judicial economy of litigating the same issue under § 12(2) as a class action is clear. The court thus finds it both appropriate and desirable to certify a defendant class of underwriters to litigate the single issue under § 12(2) of material misrepresentations and omissions in the offering materials.

### III. *Summary*

In accordance with the foregoing,

1) The motion of the Activision defendants

    (a) to dismiss the claims under § 12(2), 15 U.S.C. § 77*l* is GRANTED with prejudice;

    (b) to dismiss the claims under Cal. Corp.Code §§ 25400 and 25500 is GRANTED with prejudice;

    (c) to dismiss the claims of plaintiff Blumenfeld is GRANTED with prejudice as to the § 12(2) claim and DENIED in all other respects;

2) The motion of defendants Anderson, California Partners, William Draper III, Genstar Pacific Corporation, Sutter Hill Ventures, Paul M. Wythes and G. Leonard Baker, Jr. (Venture Capital defendants) to dismiss the claims under § 11, 15 U.S.C. § 77k, is GRANTED with prejudice;

3) The motions of California Partners and William Draper III to dismiss them as "controlling persons" and to dismiss the § 10(b), 15 U.S.C. § 78j claims are DENIED;

4) The motions of the underwriter class
(a) to dismiss the § 12(2) claim are GRANTED with prejudice insofar as they relate to Morgan Stanley;

(b) to dismiss the claims under Cal. Corp.Code §§ 25504 and 25504.1 are GRANTED with prejudice;

(c) to dismiss the claims under Cal. Corp.Code §§ 25400, 25500, 25401 and 25501 are GRANTED with prejudice insofar as they relate to Morgan Stanley;

5) Plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23(b)(3) is GRANTED as more fully described above;

6) Plaintiffs' motion for certification of a defendant underwriter class pursuant to Fed.R.Civ.P. 23(b)(3) is GRANTED with respect to claims under § 11 and the single issue under § 12(2) of whether the Registration Statement and Prospectus contained material misstatements or omissions.

IT IS SO ORDERED.